CROWN CENTRAL PETROLEUM CORPORATION, Plaintiff,

v.

Carl J. WALDMAN, Defendant.

Civ. A. No. 79–1086.

United States District Court, M. D. Pennsylvania.

March 21, 1980.

---

8. *Cf. United States v. Maskeny, supra,* at 193–94.

David Richman, Thomas E. Zemaitis, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Crown Central; Cable, McDaniel, Bowie & Bond, Baltimore, Md., of counsel.

Lewis H. Markowitz, York, Pa., for Waldman.

## MEMORANDUM

HERMAN, District Judge.

### I. INTRODUCTION

In our memorandum and order of March 6, 1980 we described the procedural steps of this action and postponed our consideration of a motion by Carl J. Waldman (hereafter referred to as "Waldman") to dismiss or strike portions of the complaint filed on August 24, 1979 by Crown Central Petroleum Corporation (hereafter referred to as "Crown"). Waldman brought his motion under F.R.C.P., Rule 12(b)(6) and 12(f) to dismiss the action for failure to state a cause of action or, in the alternative, to

strike part of the complaint. Crown's complaint consists of three counts, all rooted to some extent in the franchise relationship between Crown and Waldman. The motion is directed only at Counts II and III. We will now consider the merits of Waldman's motion.

Count I of the complaint seeks a declaratory judgment that when Crown terminated the franchise relationship with Waldman, Crown complied with the terms of both the Branded Service Station Lease and Dealer Agreement (hereafter referred to as "the Agreement") and the provisions of the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801 *et seq.* (hereafter referred to as "the PMPA") and that Crown is entitled to possession of the gasoline service station at 1049 Carlisle Street in Hanover, Pennsylvania.[1] Crown asserts its right to this relief because Waldman allegedly violated the Agreement during the summer of 1979. Specifically, Crown alleges that Waldman refused to open or operate the service station for seven consecutive Sundays from May 20 through July 1, 1979 and for the entire three-day period July 13–15, 1979.

Such willful refusals allegedly violated the express requirements of the Agreement that the service station be opened seven days each week, 365 days a year. Failure to open the station was an adequate ground for immediate termination of the franchise relationship under the Agreement. Crown has alleged a strong interest in maintaining its marketing position as an efficient, high-volume, multipump gasoline retail operation. This position requires that each station be open as much as possible and for at least some time every day.

Count II of the complaint requests a permanent injunction under the federal antitrust laws, specifically section 16 of the Clayton Act, 15 U.S.C. § 26.[2] Crown prays

1. The complaint also sought a preliminary injunction, but relief was denied by our order on March 6, 1980.

2. Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss

or damage by a violation of the antitrust laws . . . ., when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings . . . 15 U.S.C. § 26.

for an injunction prohibiting Waldman "from further participation in any conspiracy in restraint of trade in interstate commerce for gasoline or from doing any act in furtherance thereof . . . ." The complaint alleges that Waldman and competing independent gasoline retailers in Pennsylvania and Delaware restrained trade in the sale and supply of gasoline by simultaneously closing their service stations. The purpose of the closings, as admitted by Crown, was to raise and fix prices for the retail sale of gasoline solely by influencing the United States Department of Energy to modify existing petroleum price regulations to permit higher profit margins for service station operators.

■ Crown does not seek damages for any concerted action in restraint of trade that has allegedly already occurred, but it asserts the potentially irreparable injury to its trademark if Waldman continues to participate as an active member in the association through which the alleged conspiracy was formed.[3] Crown believes and therefore avers that future conspiracies are likely and it seeks to have us enjoin them.

Count III of the complaint seeks eviction of Waldman from the station under Pennsylvania law because Waldman's lease expired on June 18, 1976 and was not renewed. Crown decided not to renew the lease because a new Pennsylvania statute, 73 P.S. §§ 202–1 et seq., would have prevented Crown from enforcing parts of the Agreement that it believed were essential to its marketing philosophy.

## II. PENDING STATE ACTION

■ The subject matter and remedy sought in Count III form the basis of an identical action between the same parties in a state court. Waldman has raised this identity of issues as part of his argument that we should dismiss Count III under the

abstention doctrine. On December 19, 1979 the jury in the state proceeding returned a verdict in favor of Waldman. Although we will not dismiss Count III, we will stay all consideration of the eviction issue pending the final outcome of the action in the Pennsylvania courts. This decision to abate our decision in this count will permit the state courts to fully analyze the issues confronting them before we decide whether we should rule on the matter. *See Weiner v. Shearson, Hammill & Company, Inc.*, 521 F.2d 817, 820–22 (9th Cir. 1975).

## III. ANTITRUST CLAIM

■ The remaining portion of Waldman's motion to dismiss is directed at the alleged antitrust violation in Count II. Under the Federal Rules we may consider matters outside the pleadings when we examine the complaint for an asserted failure to state a claim upon which relief can be granted. F.R.C.P., Rule 12(b)(6). When we consider outside material, we must treat the motion as one for summary judgment under F.R. C.P., Rule 56. Because the only outside evidence we will review is the testimony of Waldman elicited and relied upon by Crown's counsel at the November 15, 1979 hearing, we do not believe that Crown needs an opportunity to present any further material.

In the direct examination of Waldman, the following dialogue took place:

Q: If I understand correctly, as a result of the dealers' dissatisfaction with [what] had been accomplished with meetings of D.O.E. [Department of Energy] and representatives of the White House, a group shutdown was hit upon as the means of further protesting the government policy in regard to ceiling prices. Is that fair?

A: Yes.

Q: Did you join in that group shutdown?

---

**3.** Crown's allegation of potentially irreparable injury is sufficient to support its claim, and a showing of a dangerous probability of such injury would justify our equitable interposition

by an injunction. *Bedford Cut Stone Company v. Journeyman Stone Cutters Association of North America*, 274 U.S. 37, 54, 47 S.Ct. 522, 527, 71 L.Ed. 916 (1927).

A: Yes, I did.

Q: And your purpose in doing so was to add to the pressure that the group hoped to bring to bear upon the government to alter its policy, is that correct?

A: Yes.

N.T. p. 62. It is clear to us from counsel's subsequent colloquy with the court that he believes that the testimony of Waldman is sufficient to substantiate Crown's antitrust cause of action:

MR. RICHMAN: There are two federal bases here, Judge. One is the Petroleum Marketing Practices Act—

THE COURT: Of course, you think you have one under antitrust too, I guess.

MR. RICHMAN: I would have hoped Mr. Waldman's testimony would have established that, yes, that's our theory
. . . .

N.T. pp. 96–97.

From our close scrutiny of Waldman's testimony and the allegations in the complaint,[4] we are convinced that we are faced with no genuine issue about any material fact related to the antitrust issue. Therefore summary judgment is appropriate under F.R.C.P., Rule 56(c).[5]

### A. Standing

█ Waldman first argues that because Crown was not the "target" of the conspiracy it has no standing to assert any antitrust violation. We believe that this argument misstates the law of the decision upon which it is purportedly based. *See Bogo-*

*sian v. Gulf Oil Corporation,* 561 F.2d 434 (3d Cir. 1977). The circuit court specifically found standing[6] in those plaintiffs injured by the alleged conspiracy. 561 F.2d at 448. Crown has clearly alleged the potential injury that it would suffer if Waldman engages in any further unlawful restraints of trade.

### B. Noerr Exemption

Waldman's second argument is that the closing of the service stations by the independent dealers was an expression of their First Amendment right to petition the government for a redress of grievances. He argues that concerted activity by a commercial association to influence the government to pass and enforce laws and regulations that may help that association's members and injure competitors or consumers is beyond the reach of the federal antitrust laws under the doctrine enunciated in *Eastern Railroad Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). Because we believe that the dealers' conduct falls within the *Noerr* exemption and that the federal antitrust laws were not intended to proscribe such activity, we will enter judgment in favor of Waldman in Count II.

### 1. Antitrust Proscriptions of Boycotts

### a. Boycotts as Per se Violations of Sherman Act

█ In 1958 the United States Supreme Court solidified a procedural device devel-

---

4. Paragraph 18 of Crown's complaint comports very closely with the evidence presented at the hearing.

    18. The purpose of this conspiracy and of the acts taken by Waldman and other participating gasoline retailers pursuant thereto was to coerce and compel those persons responsible for the promulgation of the federal Mandatory Petroleum Allocation and Price Regulations to establish and permit higher margins to operators of retail gasoline service stations than authorized by existing regulations and thereby to fix, raise and stabilize the retail price of gasoline in interstate commerce.

5. Because we are proceeding under a motion for summary judgment with all material facts admitted by both parties, Crown's arguments, based on *Hospital Building Company v. Trustees of Rex Hospital,* 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976), against granting a motion to dismiss are inapposite.

6. Although the *Bogosian* court termed this issue "standing", it noted that the real issue is one "of proximate causation distinct from the concept of personal stake necessary to establish article III jurisdiction." 561 F.2d at 447 n.6. As the circuit did, we will refer to this principle as one of "standing".

oped over the years [7] to assist in the proper interpretation of the Sherman Act—the *per se* doctrine. *United States v. Northern Pacific Railway*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The Court's condemnation of certain combinations and conspiracies was sweeping. 356 U.S. at 5, 78 S.Ct. at 518. An alleged trade restraint will be considered a *per se* violation of the Sherman Act when two factors have been established: First, the practice, if effective, is likely in the great generality of cases to cause substantial injury to competition. Second, inquiry into whether the practice will be injurious to competition in the present instance would be complex, time consuming, costly, and possibly uncertain. *See* Sullivan, Antitrust § 70 (1977).

■ Boycotts, or concerted refusals to deal, have long been included in the list of *per se* Sherman Act violations. *See, e. g., Fashion Originators' Guild of America, Inc. v. Federal Trade Commission*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). From these Supreme Court cases a definition of a boycott as a *per se* offense emerges. It is a concerted effort by traders at one level of business to keep others out or to inhibit their competitive efforts at that level by making it more difficult for them to find suppliers or customers.

■ Courts must be careful, however, not to include all activities popularly referred to as boycotts in the *per se* category of offenses. The doctrine should only be applied to concerted refusals that are intended to drive out competitors or to keep them out, but not to those in which the concerted action is designed to achieve some other goal. Concerted refusals to deal may be boycotts, but they are not necessarily *per se* offenses because they are not consistently adverse to competition. *See, e. g., Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). *See generally*, Sullivan, Antitrust, *supra*, §§ 83–84, 90. "*Per se* rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive." *Continental T. V. Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557, 50 L.Ed.2d 568 (1977). *See generally*, Maher, "On the Path from WHITE to SCHWINN to SYLVANIA to . . . .?", 82 Dick.L.Rev. 433, 435–37 (1978).

We are faced with a boycott, i. e., a group of service station operators simultaneously closed their operations for three days. But this is not a refusal to deal with particular persons. It is a total shutdown of their businesses in protest of governmental inaction. Nevertheless trade was restrained because consumers had a major source of their supply eliminated (albeit temporarily) and gasoline wholesalers had an important part of their market removed. Because we believe that the united closings were not "manifestly anticompetitive", however, we must examine the antitrust laws as they have developed independently from the *per se* doctrine.

b. *Rule of Reason*

Although section one of the Sherman Act prohibits "[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce", the Supreme Court has incorporated a test of reasonableness into the law. Since *Standard Oil Company v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), courts have applied a "rule of reason" as the prevailing standard of analysis when the *per se* doctrine is inappropriate. *Continental T. V., Inc. v. GTE Sylvania, Inc., supra*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 50 L.Ed.2d 568 (1977). Many agreements restrain trade in some

---

7. *See United States v. Joint Traffic Association*, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1897); *Standard Oil Company of New Jersey v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *United States v. Trenton Potteries Company*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927); *United States v. Socony-Vacuum Oil Company*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

way, but not all of them violate the antitrust laws. Under the rule of reason, the factfinder must consider

the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint, and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

*Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

Examining the evidence presently before us in light of the *Chicago Board of Trade* standards, we are not prepared at this time to finally decide whether the closings by the independent operators were unreasonable restraints of trade. The dealers' good intentions and lack of malicious motives may help interpret the facts before us, but they are not conclusive on our decision. *See Marjorie Webster Junior College, Inc. v. Middle States Association of Colleges and Secondary Schools, Inc.,* 139 U.S.App.D.C. 217, 221, 432 F.2d 650, 654 (D.C.Cir. 1969), *cert. denied,* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970); *Rex Chainbelt, Inc. v. Harco Products, Inc.,* 512 F.2d 993, 1006 (9th Cir.), *cert. denied,* 423 U.S. 831, 96 S.Ct. 52, 46 L.Ed.2d 49 (1975).

Whether the activities in question were unreasonable concerted actions in restraint of trade, however, is unimportant in our final deliberation. Not every form of combination or conspiracy that restrains trade falls within the ambit of the Sherman Act's protections. *Marjorie Webster Junior College, Inc. v. Middle States Association of Colleges and Secondary Schools, Inc., supra,* 139 U.S.App.D.C. 217, 220, 432 F.2d 650, 653 (D.C.Cir. 1969). The Supreme Court has established certain exemptions from the federal antitrust laws, one of which concerns the right of citizens and businesses to join together to exercise their First Amendment right to petition the government for redress of grievances.

### c. *Right to Petition Government*

The landmark decision establishing an exemption from the antitrust laws for concerted efforts to petition government is *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., supra,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). In *Noerr* the railroads had conducted an extensive lobbying and publicity campaign designed to secure the passage and enforcement of laws greatly curtailing the carriage of freight by trucks. The Court ruled:

[T]he Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly.

365 U.S. at 136, 81 S.Ct. at 529.

The Court based its decision on two points. First, a representative democracy depends upon the uninhibited ability of the people to make their wishes known to their representatives. The Act was not intended to regulate the political activity of informing the government of their wishes, but was solely intended to regulate business activity. The second reason behind the *Noerr* ruling is the interwoven constitutional question. The right of petition is one of the freedoms protected by the Bill of Rights and the Court refused to impute to Congress an intent to invade the First Amendment.

The Court went on to rule that the Railroad's purpose and intent to destroy their competitor the trucking industry did not alter the final result. Accordingly, the professedly ultimate goal of the dealers in the case before us, higher profit margins, does not affect our analysis of the *Noerr* exemption's application. Injury to competitors is an incidental effect of most campaigns designed to influence legislation. The Court refused to outlaw such campaigns merely because of some improper ultimate goal. The Court warned that certain factual circumstances may exist in other situations that would be mere shams, although they might be ostensibly directed toward influencing governmental action. The Sherman

Act is, however, applicable to activities that are nothing more than attempts to interfere directly with the business relationships of a competitor. 365 U.S. at 144, 81 S.Ct. at 533. This "sham" exception from the *Noerr* exemption was more fully examined by the Supreme Court in *California Motor Transport Company v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). There the plaintiffs brought the action alleging that the defendants had conspired to monopolize the transportation of goods by instituting numerous state and federal proceedings to resist and defeat plaintiffs' applications to acquire, transfer, or register operating rights. The Court viewed the defendants' repeated efforts to exploit the state's administrative procedures to inhibit competition as a matter different from the right to petition protected by *Noerr*. Certainly, defendants had the right to join together to contest administrative grants of operating rights, but they could not use that right of petition to interfere directly with plaintiffs' business relationships. The gist of plaintiffs' complaint was that defendants' concerted action effectively barred their right of access to the courts and administrative agencies and therefore prevented plaintiffs from acquiring needed operating rights. 404 U.S. at 511–12, 92 S.Ct. at 612.

The Court concluded that First Amendment rights may not be used as the means or pretext for achieving substantive evils that the legislature has the power to control.[8] *See NAACP v. Button*, 371 U.S. 415, 444, 83 S.Ct. 328, 343, 9 L.Ed. 405 (1963). Therefore, defendants' concerted efforts to keep their competitors out of the agencies and courts, if such could be proved at trial, would be a violation of the antitrust laws not protected by *Noerr*. 404 U.S. at 515, 92 S.Ct. at 614.

In its summary of the *Noerr* and *California Transport* decisions, one court has explained that generally, concerted efforts by persons to induce or influence passage or enforcement of laws or regulations do not violate federal antitrust laws. But to enjoy this immunity, the concerted actions must be a genuine effort to influence the governmental action and not a sham to cover what is actually an attempt to interfere directly with the commercial relationships of a competitor. *Czajkowski v. State of Illinois*, 460 F.Supp. 1265, 1280–81 (N.D.Ill.1977), *aff'd mem.*, 588 F.2d 839 (7th Cir. 1978).

The question in our present deliberation revolves about the application of *Noerr* to the closings of the dealers. It is beyond dispute that the motive and purpose of the closings was political. But the action undertaken was conduct beyond pure speech used to petition the government. The Court in *Noerr* limited its holding by the following restrictive language:

> [W]e think it clear that the Sherman Act does not apply to the activities of the railroads *at least insofar as those activities comprised mere solicitation* of governmental action with respect to the passage and enforcement of laws.

365 U.S. at 138, 81 S.Ct. at 530 (emphasis added).

The independent dealers did not simply solicit governmental action. They closed their service stations to focus the attention of the Department of Energy on their grievances. The central issue before us therefore is whether that closing was conduct protected as political speech used to petition the government under the *Noerr* doctrine.[9] If the closings can be viewed as political speech aimed at petitioning for governmental action, the *Noerr* exemption will apply and judgment should be entered for defendants in Count II.

---

8. The case under present consideration does not involve an allegation that First Amendment rights were used to achieve substantive evils. Rather, the claim is that the allegedly protected conduct *is* the substantive evil.

9. *Cf. State of Missouri v. National Organization for Women, Inc.*, 467 F.Supp. 289, 304 (W.D. Mo.1979) (the central issue is "whether NOW's actions, which are themselves an exercise of first amendment rights, constitute a violation of the Sherman Act.") *See also, Council For Employment and Economic Energy Use v. WHDH Corp.*, 580 F.2d 9, 12 (1st Cir. 1978), *cert. denied*, 440 U.S. 945, 99 S.Ct. 1421, 59 L.Ed.2d 633 (1979).

## 2. Conduct as Political Speech

### a. Political Conduct

■ Certain conduct must be examined and protected by the courts as if it were pure speech. When such conduct is found, only the most important concerns of the government outweigh the individual's right to free expression. The wearing of black armbands by school students constituted just such conduct and was protected by the Supreme Court as almost pure speech in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). As communicators of symbolic speech the students wearing the armbands were entitled to comprehensive First Amendment protection. The Court found that the wearing of armbands was virtually pure speech because it "was entirely divorced from actually or potentially disruptive conduct by those participating in it." 393 U.S. at 505, 89 S.Ct. at 736.

The preceding excerpt from the *Tinker* decision illustrates an underlying fear of assigning First Amendment protection to conduct or symbolic speech. We are concerned that otherwise punishable conduct might be insulated from the ordinary legal consequences by a cloak of First Amendment protection. Because the closings before us are not entirely divorced from disruptive action and might otherwise be punishable, the tremendous protection afforded the students in *Tinker* should not be advanced to the dealers. But less pervasive protections continue to inhere to conduct specifically undertaken to communicate a political message.

In *Spence v. State of Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (per curiam), the appellant had been convicted under a Washington statute forbidding the exhibition of a United States flag to which is attached or superimposed figures, symbols, or other extraneous materials. Spence had affixed a peace symbol made of removable tape to a flag he owned and had hung it upside down from the window of his apartment. The Washington courts ultimately upheld the conviction. The Supreme Court of the United States reversed in a per curiam decision holding that the statute impermissibly infringed upon protected expression.

The Court in *Spence* provided guidelines for the examination of conduct that is allegedly entitled to First Amendment protection:

"[W]e cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." But the nature of appellant's activity, combined with the factual context and environment in which it was undertaken, lead to the conclusion that he engaged in a form of protected expression.

\*    \*    \*    \*    \*    \*

Moreover, the context in which a symbol is used for purposes of expression is important, for the context may give meaning to the symbol.   .   .   .

It may be noted, further, that this was not an act of mindless nihilism. Rather, it was a pointed expression of anguish by appellant about the then-current domestic and foreign affairs of his government. An intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it.

418 U.S. at 409–11, 94 S.Ct. at 2730, *quoting United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968).

■ The *Spence* decision can be condensed to three rules that distinguish conduct that is protected as symbolic speech from conduct that is not within First Amendment protections. Conduct is protected expression:

1. If the conduct is a clear departure from the normal conduct of the actor and cannot be explained *in any other way* than that the actor is expressing himself.

2. If the actor has a legitimate reason to expect the audience of his conduct to view his action as communicative.

3. If the actor intended to and does communicate.

■ The circumstances surrounding the present litigation clearly satisfy the rules of *Spence*. The closings occurred simultaneously for three consecutive days. This is not the normal conduct of a service station, whether or not gas is in short supply. The independent dealers had announced to both the public and the Department of Energy well in advance of the closings that such action might be taken.[10] In the context of the rising costs of gasoline during the summer of 1979, the dealers might reasonably believe that the public and the government (their audience) would view the closings as expressive of the dealers' urgent needs and desires concerning the enforcement and enactment of energy-related regulations. Finally, the dealers intended that the closings communicate their frustration and we can reasonably believe that they did so communicate. We believe therefore that the independent dealers' action of simultaneously closing their service stations in July 1979 was conduct that constituted political speech.

Expression of an idea through conduct, however, remains at least partial conduct and may be regulable in certain circumstances and to some extent. But because it is expression of an idea through activity, courts must examine with particular care the interests advanced by those who would seek to proscribe the conduct. 418 U.S. at 411, 94 S.Ct. at 2730.

b. *O'Brien Test*

■ The standard established by the Supreme Court for examining the regulation or restriction of conduct that is expression was articulated in *United States v. O'Brien, supra,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). The Court declared:

Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

391 U.S. at 377, 88 S.Ct. at 1679. The first and third requirements—valid congressional power[11] and no purpose to suppress free expression[12]—are easily satisfied by the federal antitrust laws. The second and fourth requirements provide difficulties that are less easily dispatched.

■ The governmental interest underlying the antitrust laws is the maintenance and protection of free trade and uninhibited competition.[13] The relative strength and importance that courts must accord to that interest is illustrated by the clear dichotomy between the *Noerr* and *California Transport* decisions. A legitimately exercised First Amendment right, unquestionably conducted for the purpose of expression, outweighs the government's interest in free trade. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., supra,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). But the government's interest outweighs a facial assertion of First Amendment rights when the conduct involved constitutes a sham designed to curtail another competitor's business position. *California Motor Transport Company v. Trucking Unlimited, supra,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

---

10. Although we have no testimony to this point, we easily recall the widespread publicity the threats of closings generated in the summer of 1979. "What we know as men and women we must not forget as judges . . .." *Bradshaw v. Rawlings,* 612 F.2d 135, 142 (3d Cir. 1979).

11. The power of Congress to enact the Federal antitrust statutes is derived from its constitutionally mandated control over foreign and interstate commerce. United States Constitution, art. I, § 8, cl. 3.

12. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., supra,* 365 U.S. 127, 138, 81 S.Ct. 523, 530, 5 L.Ed.2d 464 (1961).

13. ·Because the basis of Crown's action against Waldman in Count II is a federal statute, it is the interests of the federal government in enacting the statute that are relevant to our determination.

The independent dealers' exercise of their First Amendment right of political expression through concerted conduct was unquestionably undertaken for the sole purpose of political expression. No ulterior motive or purpose has been presented to us in any pleading or through any testimony. The dealers' interest in free expression, therefore, outweighs the interest in free trade and unrestrained competition and must be exempted from antitrust prosecution under *Noerr*.

We must also examine, in this balancing of interests, the extent to which communicative activity would be inhibited by denying the *Noerr* exemption to the boycott of July 1979. L. Tribe, American Constitutional Law § 12–20 (1978). The dealers could obviously band together and present a written or oral demand on the Department of Energy to enforce existing regulations and laws and to promulgate new ones. But the dealers had been doing that with little or no apparent success. It might reasonably be that the only means of effective expression was the boycott. For us to hold that they must have continued to rely upon strictly written and oral communication would be to deny them what may have been their only effective means of communication—arousing public sentiment. This we will not do. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, supra, 365 U.S. 127, 143–44, 81 S.Ct. 523, 532–33, 5 L.Ed.2d 464 (1961).[14]

## IV. CONCLUSION

Having concluded the preceding examination, we are convinced that we have properly laid to rest our underlying fear in those conduct-as-speech cases, i. e.—that punishable actions will be cloaked in First Amendment protection. Violators of the Sherman Act will not be able to say that their violations were protected by the First Amendment without satisfying the three demanding requirements of *Spence v. State of*

*Washington, supra,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974). The key to that satisfaction in this case is the unquestioned fact that the purpose of the independent dealers' boycott was to influence the Department of Energy to enforce and enact favorable regulation and legislation. The boycott was a form of political expression protected by the First Amendment and not a sham under the *California Transport* rule.

Judgment will be entered in favor of Waldman in Count II because his participation in the concerted action of the independent dealers when they closed their service station is exempted from the antitrust laws as an exercise of his First Amendment right to petition government under the *Noerr* doctrine.

Because the subject matter concerning Count III of the Crown complaint is the basis for a pending state action, we will abate all consideration of Count III until the state action is finally resolved.

---

**14.** The fourth requirement of the *O'Brien* test is that the government control of First Amendment rights be the least restrictive possible. This demand of minimal restriction is satisfied in the antitrust laws only by the judicially created *Noerr* exemption. For the effect of the antitrust laws to be as unrestricted as possible on the dealers' symbolic conduct, the *Noerr* exemption must be applied.