**CROWN CENTRAL PETROLEUM CORPORATION, Plaintiff,**

v.

**Carl J. WALDMAN, Defendant.**

**Civ. A. No. 79–1086.**

United States District Court,
M. D. Pennsylvania.

May 19, 1981.

Juliet A. Eurich, Baltimore, Md., David Richman, Thomas E. Zemaitis, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for plaintiff; Morton A. Sacks, Cable, McDaniel, Bowie & Bond, Baltimore, Md., of counsel.

Lewis H. Markowitz, York, Pa., for defendant.

## MEMORANDUM

HERMAN, District Judge.

## I. INTRODUCTION

Plaintiff initiated this action on August 24, 1979 by filing a complaint seeking termination of the franchise relationship between it and Defendant.[1] On September 24, 1979, Defendant filed a motion and supporting brief to dismiss Count II of the complaint and to strike Count III. Plaintiff opposed that motion by filing a brief on October 23, 1979. By our opinion and order filed on March 21, 1980, we construed the motion as if it were for summary judgment and granted it, thereafter entering judgment in favor of Defendant in Count II. 486 F.Supp. 759 (M.D.Pa.1980). We stayed further consideration of Count III pending the results of a state court action involving the identical issue.[2] Plaintiff filed its appeal of our March 21, 1980 order on April 11, 1980.

On October 11, 1979, Defendant had initiated his own action against Plaintiff at docket C.A. No. 79–1280. Defendant sought essentially the converse relief requested by Plaintiff in this action, i. e., upholding the franchise relationship. Defendant also sought certain damages from Plaintiff in the second action. We consolidated the two actions on December 7, 1979, thus transforming Defendant's demands into counterclaims.

The Third Circuit Court of Appeals filed its opinion in Plaintiff's appeal on November 17, 1980, reversing and remanding the case to us on a procedural matter. 634 F.2d 127 (3d Cir. 1980). On December 12, 1980, we ordered rebriefing of the motion to dismiss as construed as a motion for summary judgment. Plaintiff filed its own motion for summary judgment in Counts I and II with a supporting brief on January 21, 1981. Defendant filed a brief supporting his former motion to dismiss on January 22, 1981. Defendant filed a brief opposing Plaintiff's motion for summary judgment on March 9, 1981. Plaintiff closed the briefing by filing its reply brief on March 23, 1981. The motions for summary judgment on Counts I and II are now ripe for our consideration.

## II. FACTUAL BACKGROUND [3]

On December 19, 1973, Plaintiff Crown Central Petroleum Corporation (hereafter referred to as "Crown") and Defendant Carl J. Waldman (hereafter referred to as "Waldman") entered a Branded Service Station Lease and Dealer Agreement (hereafter referred to as "the Agreement"). Waldman's leased service station is located in Hanover, Pennsylvania. Although the Agreement expired on June 18, 1976, its terms continue to govern Waldman's operation and possession of the station. The Agreement is uniformly employed throughout Crown's marketing system and its standards of operation apply to both dealer-operated and company-operated service stations.

The station is situated on land owned by Crown and was built at Crown's expense. Crown dealers, including Waldman, do not pay franchise fees. They make only an initial investment limited to the purchase of the gasoline in the tanks, a refundable security deposit of $2,500.00, and other mar-

---

1. Plaintiff also moved for a preliminary injunction on September 18, 1979. We held a hearing on the motion on November 15, 1979 and granted Plaintiff's alternative relief on March 6, 1980.

2. The state court jury found for Defendant and Plaintiff has effectively conceded the res judi-

cata effect of that result. *See* Plaintiff's Brief, p. 3 n. 1 (filed Jan. 21, 1981).

3. The facts related here have been drawn from uncontested testimony and exhibits from the November 15, 1979 hearing and from the documents and affidavit filed in support of the motions now before us.

ginal expenses such as uniforms, paper towels, and supplies.

The Agreement, in its standards of operation, specifically requires the dealers to keep the service station open and operating without interruption 24 hours per day, seven days per week, except in circumstances beyond the dealers' control. The Agreement includes a provision for immediate termination if the dealer fails to keep the station open and operating continuously. The Agreement also contains general provisions that govern the manner of operation of the station. One of these provisions is a covenant to comply with all applicable laws and regulations covering operation of the business and the dealer's use and possession of the service station. The breach of this covenant is also a ground for immediate termination in the Agreement.

In the spring and summer of 1979 a nationwide shortage of gasoline rendered Crown unable to supply an unlimited quantity of gasoline to its dealers as it had in the past. Crown was forced to allocate products to its stations in accordance with Department of Energy regulations. Crown therefore notified its dealers by letter dated April 27, 1979 that it would temporarily waive the provision that stations must be open 24 hours each day. Stations were allowed to close from 9:00 p. m. to 5:00 a. m. On May 4, 1979, the worsening shortage led Crown to adjust even that modification by permitting closings from 7:00 p. m. to 7:00 a. m. Moreover, stations were allowed to close when they exhausted their daily allotment.

Although the shortage and mandatory allocation required curtailment of the *continuous* operation, Crown did not want its stations closed during an entire day. Therefore, while permitting closings during certain hours of each day, Crown re-emphasized its requirement that each station must be open and operating seven days each week. The May 4, 1979 letter stated:

This waiver [of the 24 hour requirement] does not effect [sic] any other provision of the Agreement, and, in particular, you will be obligated to have the station open

seven days a week and you will be expected to sell your full allocation.

Crown received favorable publicity through the gasoline shortage by maintaining its seven days each week policy because the public knew that Crown stations would open at 7:00 a. m. every day.

Waldman, however, failed to open or operate his service station on seven consecutive Sundays, beginning May 20, 1979 and ending July 1, 1979. He also failed to open or operate the station on the weekend of July 13–15, 1979. The Sunday closings were done unilaterally by Waldman because he felt it was in the public's best interest to close on Sundays. The July weekend closing resulted from a decision of members of the Pennsylvania-Delaware Service Station Dealers Association to close their businesses completely in protest of the mandatory petroleum price regulations promulgated by the Department of Energy. The regulations limited the amount that a dealer could add to his purchase price of gasoline when selling it retail, thus limiting the profit margins of the dealers.

Waldman knew that his refusal to open the station every day violated his obligations under the Agreement. He also knew that none of his closings were authorized by Crown. Crown representatives spoke with Waldman on at least three occasions and advised him that the closings violated the Agreement. Waldman ignored them.

III. ARGUMENTS

A. *Plaintiff's Position*

Crown bases its action in Count I on the Petroleum Marketing Practices Act, Act of June 19, 1978, Pub.L. 95–297, 15 U.S.C. §§ 2801 *et seq.* (hereafter referred to as "the PMPA"). In particular, Crown relies upon four transgressions of the Agreement or business relation committed by Waldman, each of which allegedly justifies termination of the franchise relationship under the PMPA.

First, Crown's primary argument is that Waldman failed to comply with a reasonable and material provision of the Agreement, continuous operation, by closing on

the seven consecutive Sundays and the weekend in July 1979. Such a failure would violate 15 U.S.C. § 2802(b)(2)(A) and would therefore permit termination of the relationship under the PMPA.

Second, Crown insists that Waldman failed to exercise good faith efforts to carry out the provisions of the Agreement after notice of his deficiency and an opportunity to remedy the problem. Under 15 U.S.C. § 2802(b)(2)(B), such a failure would justify Crown in terminating the relationship.

Third, Waldman allegedly failed to open or operate the service station for a period of time that, under the surrounding facts and circumstances, constituted an unreasonable period of time, i. e., it was unreasonable for Waldman to close the station for the seven consecutive Sundays and the weekend. 15 U.S.C. § 2802(b)(2)(C), *as defined by* 15 U.S.C. § 2802(c)(9).

Finally, Crown claims that Waldman, by allegedly violating the federal antitrust laws, knowingly failed to comply with federal, state, or local laws or regulations relevant to the operation of the station. 15 U.S.C. § 2802(b)(2)(C), *as defined by* 15 U.S.C. § 2802(c)(11).

### B. Defendant's Position

Waldman has countered Crown's allegations without denying that they occurred. Rather, Waldman has offered four affirmative defenses that he claims either justify his actions or negate Crown's right to complain. None of Waldman's arguments are based on the PMPA.

First, Waldman contends that Crown's reliance on his violations of the Agreement is simply subterfuge to conceal Crown's true motives. Waldman claims that Crown acted, and is acting, in bad faith because it wants only to convert its high-volume product outlets into company operations to make more profit.

Second, Waldman insists he will be able to prove that Crown has suffered, and will

suffer, no financial damages from Waldman's closings. Waldman appears to be arguing that proof of some financial injury is a prerequisite to termination of the relationship for violation of the Agreement's provisions. Related to this defense is Waldman's request to conduct discovery relating to Crown's economic injury before we rule on the motions before us.

Third, Waldman claims that the extraordinary circumstances surrounding the gasoline shortage in 1979 made it unreasonable for Crown to insist that its requirements of operation be followed. Waldman indicated that he differed with Crown on what was fundamentally the best policy to follow for the good of the country.

Finally, Waldman recalls that Crown made certain exceptions to its requirements of operation in the 1973–74 gasoline shortage. He apparently maintains that the provisions of the Agreement, once temporarily waived under exigent circumstances, cannot be enforced when similar circumstances arise again five years later.

### IV. DISCUSSION

#### A. Statutory Requirements for Termination

Prior to termination[4] of the franchise relationship, a franchisor must notify the franchisee of the termination in a writing posted by certified mail or hand-delivered. 15 U.S.C. § 2804(a)(1), (c)(1), & (c)(2). The writing must contain a statement of the franchisor's intention to terminate the relationship with the reasons therefor, the effective date of termination, and the summary statement prepared by the Secretary of Energy and published in the Federal Register. 15 U.S.C. § 2804(c)(3). The effective date of termination may not be less than 90 days subsequent to the date on which the notice is given. 15 U.S.C. § 2804(a)(2).

█ Crown satisfied each of the notice requirements for termination by its letter

---

**4.** We will refer to the "termination" of the franchise agreement and will regard the PMPA as controlling. Although Crown technically refused to renew the franchise, the PMPA is applicable as if it were a termination. 15

U.S.C. § 2801(14)(C). *See Frisard v. Texaco, Inc.,* 460 F.Supp. 1094 (E.D.La.1978). Waldman does not argue that the PMPA is inapplicable.

to Waldman of July 13, 1979, which was posted by certified mail. The notice declared Crown's intention to terminate the relationship effective October 15, 1979 and explained Crown's reasons for deciding to terminate. The notice also included a summary of rights prepared and published by the Secretary of Energy. Crown's supplemental notice of termination, dated July 17, 1979 also satisfied the above requirements. Waldman does not contest the validity or sufficiency of these notices of intent to terminate. We hold that they were proper and sufficient under the PMPA.

█ Termination by the franchisor under the first, third, and fourth reasons advanced by Crown carries certain other timing requirements. Crown must have acquired actual or constructive knowledge of the actions at the base of its decision to terminate not more than 120 days prior to the date on which notification is given, if such notification is given pursuant to 15 U.S.C. § 2804(a). 15 U.S.C. § 2802(b)(2)(A)(i) & (C)(i). Alternatively, the franchisor must have known of the action not more than 60 days prior to the date of notice, if less than 90 days notice is given pursuant to 15 U.S.C. § 2804(b)(1). 15 U.S.C. § 2802(b)(2)(A)(ii) & (C)(ii). The first Sunday on which Waldman refused to open or operate the station, which is the first action on which Crown relies, was May 20, 1979. The notices of termination were sent out on July 13 and 17, 1979, both of which are within the more restrictive 60-day time limit. Again, Waldman does not argue that Crown failed to satisfy this requirement. We hold that Crown satisfied the above timing requirements.

█ We do not believe, however, that Crown has complied with the requirements for its second reason offered for termination—failure to exert good faith. Before such a basis for termination may be offered, the franchisor must apprise the franchisee *in writing* of the failure so that the franchisee has a reasonable opportunity to exert good faith efforts. 15 U.S.C. § 2802(b)(2)(B)(i). The continued failure must then occur within 180 days before the

date of notification of termination. 15 U.S.C. § 2802(b)(2)(B)(ii). Although Crown asserts in its brief that three of its representatives advised Waldman of the violations of the Agreement before its notice of termination, Brief of Plaintiff, p. 13 (filed Jan. 21, 1981), Waldman avers that this advise was verbal and not in writing. Crown does not dispute this. The burden of establishing that proper notice was given is on Crown, and it did not meet that burden. We hold for Waldman in ruling that his alleged failure to exert good faith efforts to carry out the Agreement could not be a valid reason for termination under the PMPA.

Crown has complied, therefore, with all conditions precedent to its termination of the franchise relationship based on its first, third, and fourth reasons. We will now examine each of those substantive points to determine if Crown's termination of its relationship with Waldman was justified.

*B. Failure To Comply with Reasonable and Material Provisions of the Franchise Agreement*

Defendant has provided us with no evidence or persuasive legal argument to refute Plaintiff's first basis for termination of the franchise arrangement. Crown claims that Waldman failed to comply with a reasonable and material provision of the Agreement, i. e., service stations must be open seven days each week.

Neither party disputes that the Agreement required continuous operation of the station 24 hours per day and seven days per week. Neither party disputes that Crown temporarily waived the 24 hour per day requirement during the spring and summer of 1979 and that this waiver did not apply to, but specifically required compliance with, the seven days per week requirement. Finally, neither party disputes that Waldman willfully and knowingly refused to open or operate his station for seven consecutive Sundays and one three-day weekend during the spring and summer of 1979. The only issue in dispute is whether the requirement of continuous operation of the

station, as modified by Crown, is reasonable and material.[5]

1. *Reasonable and Material Requirement*

Prior to the 1960's, Crown marketed gasoline through low-volume two- and three-bay service stations. Because Crown believed this conventional method economically unfeasible, it developed a high volume, multi-pump method of operation. One of the unique features of Crown's program is the uniform policy of requiring all stations to maintain continuous operations 24 hours per day, 365 days per year. An executive of Crown termed the continuous operation policy "the cornerstone of our operation." Transcript of Preliminary Injunction Hearing, p. 8 (hereinafter referred to as "N.T."). During the gasoline shortage of 1979, Crown received favorable publicity from the printed and electronic media and developed its popularity with the public. N.T. 29. Moreover, Crown's uniformity in a vital, high visibility feature, such as continuous operation, is important to its public image. *See, e. g., Principe v. McDonald's Corporation,* 631 F.2d 303, 309 (4th Cir. 1980) (uniformity among franchises is important).

The reasonableness of the continuous operation requirement has been reviewed in prior litigation and has been upheld. A New Jersey court found good cause for the termination of a dealer under the New Jersey Franchise Practices Act, N.J.S.A. § 56:10–1 et seq., and reviewed, *inter alia,* the continuous operation policy:

The 24 hour per day, seven day per week operation is a key policy, what has been referred to as a hallmark policy of Crown Central Petroleum, subject only to zoning restrictions and to emergencies beyond the dealer's control.

The Court should not weigh in balance the economic advisability of continuous operation at most locations . . . if there is a reasonable basis for it. The reasonable basis suggested is that this policy not only makes business on the midnight shift, it attracts customers at other times, customers who have been served on the midnight shift and developed some relationship with the station or its personnel; customers who think in terms of getting gas at Crown because they know it is always open.

This is a common sense basis or a basis founded on common understanding and experience. This Court makes a finding that that is a reasonable regulation.

*Crown Central Petroleum Corporation v. Agin,* No. C–2424–74, slip op. at 8–9 (N.J. Super.Ct., Ch.Div., Middlesex Co., May 28, 1975). *Accord Raindance, Inc. v. Crown Central Petroleum Corporation,* No. C–3279–76 (N.J.Super.Ct., Ch.Div., Ocean Co., June 6, 1977).[6] Crown suggests, furthermore, that by modifying the continuous operation policy to meet the exigencies of the gasoline shortage, it reasonably altered the requirement both to maintain uniformity among dealers and to preserve as much as possible the goodwill and publicity associated with its trademark.

2. *Waldman's Defenses*

In his examination of Waldman at the preliminary injunction hearing, Waldman's counsel appeared to intimate that insufficient fuel allocations may have caused him to close. N.T. 49–50. But Waldman, in both direct and cross examination, admitted that the reason he closed on those Sundays was twofold. First, by closing Sundays, he could stay open later on Fridays and Satur-

---

**5.** By phrasing the issue this way, we avoid Waldman's defense based on the PMPA definition of "failure." The term "failure" does not include—

(A) any failure which is only technical or unimportant to the franchise relationship; or

(B) any failure for a cause beyond the reasonable control of the franchisee.

15 U.S.C. § 2801(13). Refusal to follow a *material* requirement satisfies section (13)(A) and

refusal to follow a *reasonable* requirement satisfies section (13)(B). If the requirement is both material and reasonable, a refusal to follow it must be a "failure" within the PMPA.

**6.** Although AGIN and RAINDANCE specifically address only the 24-hour requirement, the rationale and "common sense" approach apply equally to the seven days each week requirement.

days. N.T. 76–77, 86–87. Second, Waldman decided that opening on Sundays would be an invitation for the public to waste gas. N.T. 64–65, 76. Nowhere in his testimony or subsequently filed exhibits does Waldman suggest that he was *unable* to open on those Sundays in 1979. Both of his offered reasons for closing were unilateral decisions, one for his business purposes and the other for his personal perceptions of the national interest. Neither reason is a sufficient defense to Crown's allegations.

### a. *Waiver of the requirement by Crown*

Waldman argues that the continuous operation provision is not really material to Crown because it has waived it in part or in whole in the past. Crown waived the 24 hours per day requirement during the 1979 shortage and permitted hours and days of closings in the 1973–74 shortage. N.T. 79. As we mentioned earlier, however, Crown expressly informed its dealers that it was *not* waiving the seven days per week requirement. This express reminder that dealers must open and operate seven days each week rebuts any alleged reliance on the policy adopted by Crown five years earlier. It could well be that Crown learned from this prior experience that it should not permit closings for a full day. In any event, the reaffirmation of the daily operation requirement negates the waiver argument.

Moreover, we do not believe that Crown's decision to waive enforcement of part of the continuous operation requirement in any way reflects adversely on the materiality of another part. The 24 hours per day remained a material provision of the Agreement, but it would have been unreasonable for Crown to require a dealer to remain open during hours in which he could pump no gas. The seven days per week remains a material provision, and it was not unreasonable for Crown to require each dealer to open every day at the same time until he exhausted his daily allocation of gasoline.

### b. *Crown's bad faith*

Waldman also attacks the reasonableness and materiality of the continuous operation policy by alleging, in unsworn statements in his brief, that Crown is proceeding in bad faith. Waldman claims that Crown is using the PMPA as a subterfuge for its true desire to take over a profitable, independently operated service station. Defendant's Brief, pp. 3–7 (filed Mar. 9, 1981). Waldman explained that Crown has tried to remove him from his service station since 1976.

Waldman has failed to advance any evidence of Crown's bad faith for our consideration. His reference to the record from the related Pennsylvania Common Pleas case is certainly not persuasive to his position. On the contrary, the jury in the state action found that Crown's reason for seeking to terminate its relation with Waldman was as it stated and not to take over a profitable dealership. Reproduced Record, p. 230a. The York County jury's finding of Crown's honesty-in-fact negates the inference Waldman seeks to draw from that court's record. Despite the testimony Waldman offered concerning ulterior motives for Crown's attempt to terminate Waldman, the jury found that Crown acted in good faith.

Nor do Waldman's conclusory averments of "short" deliveries, overcharges, and midnight deliveries indicate bad faith. Affidavit of Waldman, ¶ 2 (filed Mar. 9, 1981). Waldman has given no indication of his attempts to recover any overpayments, or the results of those attempts. Waldman provides us with no authority for the position that deliveries could not be made after midnight. We do not believe that Waldman has established any basis for his claim of bad faith by Crown.

More important than the establishment of Crown's bad faith is its relevance to Crown's termination of Waldman's franchise relationship. Good faith is expressly made a condition for termination in only two subsections of the PMPA, neither of which has been advanced by Crown. Termination of a franchise relationship is permitted if the franchisor decides to withdraw entirely from the relevant geographical area only if such a decision is made in good

faith. 15 U.S.C. § 2802(b)(2)(E). Termination of the relationship is permitted upon the failure of the franchisor and the franchisee to agree to changes in or additions to the franchise agreement only if the changes are suggested in good faith. 15 U.S.C. § 2802(b)(3)(A)(i).

The good faith condition was intended to avoid sham decisions by a franchisor to justify discontinuing a franchise relationship. *Munno v. Amoco Oil Company*, 488 F.Supp. 1114, 1118–19 (D.Conn.1980). When termination is predicated on actions by the franchisee, and not by the franchisor, the need to avoid sham justifications for the franchisor's decisions to terminate the franchise is drastically reduced. The franchisee's conduct can be objectively measured against the requirements of 15 U.S.C. § 2802(b)(2). Once a franchisee accepts the legal and contractual obligations of the franchise agreement, he is not free to disregard them. The PMPA does not command or authorize scrutiny of Crown's motives in seeking termination for Waldman's breach of the Agreement.

#### c. *Selective enforcement*

We do not mean to suggest that a franchisor's bad faith would never be relevant in an action under the PMPA. A franchisor will not be permitted to selectively enforce its franchise agreement, i. e., permit some franchisees to violate it while condemning others for doing so. *See, e. g., Gilderhus v. Amoco Oil Company*, 470 F.Supp. 1302 (D.Minn.1979).

Waldman claims that Crown has not sought termination in the cases of three dealers who closed once each during the spring of 1979. N.T. 36, 50. We note, however, that the circumstances in the cases of those other dealers are markedly different. They closed one time each and, after a warning by Crown or of their own accord, they opened every day during the remainder of the 1979 gas shortage. Waldman, on the other hand, ignored Crown's warnings and closed for seven consecutive Sundays and a three-day weekend. We do not believe that Crown's efforts to terminate Waldman for his egregious breach of the Agreement are fundamentally contradictory to its decision not to terminate the other three dealers.

#### d. *No evidence of damage to Crown caused by Waldman's closings*

Waldman has also argued that Crown has failed to present any evidence of harm caused by Waldman's refusal to open on Sundays. He also seeks to have us stay or deny this motion pending further discovery efforts to be undertaken by his expert. His expert seeks empirical data on the following topics:

1. What material damage, if any, related to the performance of Waldman's station were [sic] sustained by Crown due to Waldman's actions?

2. What material damage, if any, related to the overall operation of the entire Crown retail gasoline operation were [sic] sustained by Crown due to Waldman's actions?

3. What material damage, if any, were [sic] suffered by consumers due to Waldman's actions?

4. What are the economic impacts on Crown of taking over direct operation of the Waldman station?

Defendant's Brief, pp. 11–12 (filed Mar. 9, 1981).

Damage to Crown caused by Waldman's transgressions is irrelevant under the PMPA. Nowhere in the statute's sections can we find language directing us, or even permitting us, to consider whether Waldman's breach of the Agreement caused Crown some quantifiable injury. The legislative history of the PMPA is especially helpful on this issue:

> While a franchisor is entitled to reasonable expectations of compliance by the franchisee with the provisions of the franchise agreement, the propriety of resort to termination of the franchise for the most technical or minor violations of the contract must be questioned. Termination is an extreme remedy. It is fundamentally punitive and not compensatory in nature, i. e., the franchisor is not

compensated for any financial injury experienced by reason of the franchisee's contractual violations. Instead the franchisee is punished through contract termination. On the other hand, franchise termination may be appropriate as a remedy for franchise misconduct in some cases. *Some contractual violations, although not readily reducible to a dollar value, may be so serious as to undermine the entire relationship.* In such cases, termination may be the only means available to the franchisor to assure against further violations in the future. Thus the remedy may be particularly appropriate where a course of conduct is involved and the need is thereby demonstrated to protect against further injury resulting from the likelihood of a repeated violation in the future. S.Rep.No.95–731 at 18, *reprinted in* [1978] U.S.Code Cong. & Ad.News 873, 876. We will not accept statements about the alleged absence of damage from a single dealer's breach of the Agreement as relevant. Waldman suggests that Crown may not enforce its continuous operation policy against a single dealer merely because it suffers no measurable impact from that single breach. We cannot agree with that suggestion.

### 3. *Conclusion*

■ We agree with another federal court that has ruled that Congress could not have intended for us to evaluate particular business judgments and policies as long as we find some reasonable basis for them and they are applied in the normal course of business and in good faith. *Ferriola v. Gulf Oil Corporation,* 496 F.Supp. 158, 162 (E.D. Pa.1980). The only evidence before us indicates that the policy of continuous operation is reasonable and was applied to Crown's franchisees, including Waldman, in the normal course of business and in good faith.

The question of whether the determination of reasonableness and materiality under the PMPA is one of law or of fact has yet to be resolved definitively by federal courts. In the matter now before us, that issue's resolution is not critical. If it is a matter of law, we believe that the provisions of the Agreement and Crown's demand for their enforcement are both reasonable and material. If it is a matter of fact, we believe that Waldman has presented no relevant evidence countering Plaintiff's strong showing of reasonableness and materiality. *See Kajdan v. Exxon Company,* 1980–1 CCH Trade Reg.Rep. ¶ 63,262 (D.Conn.1980). In either event, the continuous operation requirement, as modified by Crown, was a reasonable and material provision of the Agreement. Waldman's intentional and persistent violation of the Agreement is sufficient for Crown to terminate the franchise arrangement pursuant to 15 U.S.C. § 2802(b)(2)(A). We will grant Crown's motion on this issue and will direct the Clerk to enter judgment in favor of Crown and against Waldman.

### C. *Failure To Operate for Unreasonable Time*

■ Crown argues, quite simply, that Waldman's failure to open or operate the service station for ten days out of 60 is unreasonable. The PMPA condemns the occurrence of an event, relevant to the franchise relationship, as a result of which termination of the franchise relationship is reasonable. 15 U.S.C. § 2802(b)(2)(C). Although that section appears to say only that a franchisor may terminate the relationship if it is reasonable to do so, the PMPA provides a list of examples of events that show when it is reasonable to terminate. 15 U.S.C. § 2802(c). One of the examples is the failure of the franchisee to operate the station for seven consecutive days, 15 U.S.C. § 2802(c)(9)(A), or for some lesser time that, under the facts and circumstances, constitutes an unreasonable period of time. 15 U.S.C. § 2802(c)(9)(B).

Crown relies heavily on its previous argument that the continuous operation requirement is both material and reasonable. Therefore, Crown asserts, closing for ten days out of 60 must be unreasonable. Crown adds that Waldman's persistence in closing the station in the face of repeated warnings by Crown personnel not to do so, makes termination even more reasonable. We agree.

Waldman responds that he did not close seven consecutive days (presumptively unreasonable) and that closing on the days that he did was not unreasonable. In his defense, Waldman raises the same points we examined in the preceding discussion about adhering to the continuous operation provision: extraordinary circumstances; waiver by Crown; other dealers closed; no evidence of damage to Crown; and the closings were in the best interests of the public. As in our prior review of these defenses, we are unpersuaded. We will order the Clerk to enter judgment in favor of Crown and against Waldman on this issue.

D. *Failure To Comply with Federal, State, or Local Laws or Regulations*

Another of the specific examples offered in the PMPA as an event relevant to the franchise relationship that would justify termination is a knowing failure of the franchisee to comply with federal, state, or local laws or regulations relevant to the operation of the station. 15 U.S.C. § 2802(c)(11). Crown alleges that Waldman knowingly violated the federal antitrust laws by joining in the coordinated closings of the independent service station dealers on July 13–15, 1979. Therefore, Crown argues, the franchise relationship with Waldman may be terminated pursuant to the PMPA.

Because we do not believe that Waldman knowingly violated the federal antitrust laws,[7] we find in his favor and against Crown on this issue.

V. CONCLUSION

The only relief sought by Crown in Count I is a judicial declaration that Waldman's breach of his contractual obligations is sufficient under the PMPA to permit Crown to terminate its franchise relationship with him lawfully. We will grant it. Moreover, Crown had no duty under the PMPA to renew its franchise relationship with Waldman. We will enter judgment in favor of Crown and against Waldman in Count I.[8]

---

7. See *Crown Central Petroleum Corporation v. Waldman*, 486 F.Supp. 759 (M.D.Pa.1980). Although the Third Circuit Court of Appeals reversed and remanded that decision to us, 634 F.2d 127 (3d Cir. 1980), it did so on a procedural ground. We were ordered to permit Crown to present more evidence for our consideration of the summary judgment motion. We did so, but Crown failed to produce anything that contradicted the facts on which we based our antitrust decision. Because no new facts have been offered and the circuit court has not ruled to the contrary, we will base our present decision on the conclusion of our prior memorandum. *But see Osborn v. Pennsylvania-Dela-* ware *Service Station Dealers Association*, 499 F.Supp. 553 (D.Del.1980).

8. Despite our belief that our prior decision on Count II, the antitrust count, remains valid (*see* footnote 7, *supra*), we also note that Count II must be moot in light of our disposition of Count I above. Because we hold that Crown may lawfully terminate its franchise relationship with Waldman, an order enjoining Waldman from conducting or participating in any further coordinated closings would be meaningless. We will, therefore, enter no judgment in Count II, but will regard it as moot.