THOMSEN, Senior District Judge.
 

 Defendant Crown Central Petroleum Corporation (“Crown”), a Maryland corporation, markets gasoline at the retail level in Maryland through more than forty branded retail service stations which are owned by Crown and leased to and operated by retail dealers. Plaintiff Day Enterprises, Inc. (“Day Enterprises”), a Maryland corpora
 
 *1287
 
 tion, occupied and operated a Crown retail gasoline service station as an independent lessee-dealer under a series of one-year franchise agreements beginning in 1973. On May 28, 1980, Crown notified Day Enterprises that it was terminating their franchise relationship, effective September 2, 1980, pursuant to § 102(b)(2)(A) and (B) of the Petroleum Marketing Practices Act, P.L. 95-297, Title I, 92 Stat. 331 (1978), (“PMPA”), 15 U.S.C. § 2802(b)(2)(A) and (B).
 
 [1]
 

 On July 1, 1980, Day Enterprises filed this action against Crown under § 105 of PMPA seeking: (1) a preliminary injunction enjoining Crown pendente lite from terminating the franchise; (2) a declaratory judgment under § 105(b) that Crown’s attempted termination of the franchise violates PMPA; (3) a permanent injunction ordering Crown to continue its franchise relationship with Day Enterprises for an additional one year term; (4) attorneys’ fees under § 105(d); and (5) other and further relief.
 

 In its Answer and Counterclaim, Crown takes the position that its termination of the Day Enterprises franchise satisfied the requirements of PMPA, and seeks declaratory and injunctive relief: that the termination satisfied the requirements of PMPA and that Day Enterprises ■ be required to surrender possession of its Crown station. Crown also seeks an award of costs and reasonable expenses of litigation.
 

 By agreement of the parties, this court entered an order: noting that the parties had agreed to maintain the status quo and to comply with the terms of an interim agreement pending a consolidated hearing, and directing (1) that the trial on the merits be consolidated with the hearing on the motion for preliminary injunction and (2) that Day Enterprises remain in possession of the service station leased from Crown until the decision of the court, subject to all the terms and conditions of the Branded Service Station Lease and Dealer Agreement (dealer agreement) between Day Enterprises and Crown effective July 1, 1979. Following discovery, the parties filed Stipulations and Proffers “to obviate the necessity of an evidentiary hearing in this case or to limit the scope of such a hearing if one is necessary.” Each party agreed to be bound by its proffers. The parties also agreed that the court might draw reasonable inferences from undisputed facts. Crown submitted a Motion for Summary Judgment and an accompanying Memorandum of Law; Day Enterprises filed a Memorandum in Opposition to Crown’s Motion, and a Cross Motion for Summary Judgment, to which Crown filed a Reply Memorandum. On December 11, 1981, the court held a hearing, at which Richard Day (President of Day Enterprises) and his wife testified and both parties submitted the case for decision.
 

 On June 26, 1973, Richard Day as an individual entered into a lease and dealer
 
 *1288
 
 agreement with Crown. That agreement was renewed, with certain changes, until March 13, 1975, when he assigned his rights and obligations under the existing agreement to Day Enterprises, Inc., of which he is the President and principal or sole owner. After that assignment Crown and Day Enterprises entered a series of one-year lease and dealer agreements. Richard Day is the “active participant” in Day Enterprises, Inc., as that term is used in those agreements. The dealer agreement at issue in this case was entered into on July 1, 1979 and expired by its terms on June 30, 1980.
 

 All the dealer agreements between Crown and its independent lessee-dealers from 1976 to the present have provided that the lessee-dealer or, if the lessee dealer is a corporation, the “active participant” devote his “substantial full time” to the operation of the service station; specifically, those agreements included the following “substantial full time provision”:
 

 Dealer shall devote substantially his full time exclusively to the operation of the Station. “Substantially full time” shall mean both (i) personal attendance at the Station not less than forty (40) hours per week exclusive of absence during periods of illness or for reasonable vacation periods plus (ii) in the event the Dealer has any direct or indirect interest, either as a proprietor, partner, employee, officer, director, stockholder, creditor or otherwise in any business enterprise other than the Station, performance of services in the management and operation of the Station for at least ninety percent (90%) of the aggregate time spent by the Dealer in performance of services of any type (whether with or without compensation) for all business enterprises, including the Station, in which the Dealer has such an interest. Any time during which the Dealer is personally present at a place of business of any such business enterprise other than the Station shall be conclusively presumed to have been spent solely for the performance of services for such other business enterprise.
 

 Richard Day testified that he did not understand that the annual dealer agreements required that he spend 40 hours a week
 
 at
 
 his Crown station. He is a college graduate, and the court finds that he should have realized that the unambiguous provision in the agreement, quoted above, meant what it said.
 

 At all material times Richard Day has had a fifty percent interest in the following Maryland corporations: Retail Petroleum Services, Inc., which operates a Gulf station and an Amoco station on Interstate 95 between Baltimore and the Delaware line; Campday, Inc., which owns and operates Betty & Jake’s Tavern in Catonsville, Maryland; and Ridgely Inn, Inc., which owns and operates a restaurant/lounge located in Timonium, Maryland. Although there is some dispute as to the number of hours Richard Day devoted and devotes to all his outside businesses, the parties have stipulated and Richard Day has testified that he devotes 10 hours per week to the operation of Betty & Jake’s Tavern. Richard Day has testified that he devoted little time to his other outside business interests, because his business partner, father or hired managers had responsibility for the operation of those businesses. Based upon the depositions, the credible testimony presented to this court during the hearing and the stipulations, the court finds and concludes that Richard Day devotes at least 2 to 3 hours per week to those other outside businesses. So, the court finds and concludes that at all material times Richard Day devoted at least 12 to 13 hours per week to the operation of businesses other than his Crown station, and considerably less than 90% of his “business time” to his Crown station.
 

 To ensure compliance with the various provisions of the dealer agreements, including the “substantial full time” provision, Crown has conducted unscheduled, periodic inspections of its service stations. Throughout the period July 1, 1979 to February 12, 1980, Richard Day was not present when any of the 41 inspections of the Day Enterprise station were conducted.
 

 
 *1289
 
 On March 28, 1980, Crown sent Day Enterprises a Notice of Nonrenewal. Similar notices were sent to all of Crown’s Maryland stations. In those notices, Crown advised that the 1979-80 Dealer Agreements would not be extended or renewed and offered most lessee-dealers a new lease for a one year term commencing July 1, 1980. In the notice sent to Day Enterprises and several other dealers, Crown’s offer of a new lease was made contingent upon correction of deficiencies specified in the notice. The notice sent to Day Enterprises advised Day that Crown was willing to enter into a new Lease and Dealer Agreement commencing on July 1, 1980 and ending June 30, 1981, contingent upon Richard Day’s devoting substantially full time to the operation of his station and rectifying certain specified deficiencies in the operation “immediately. . .and. . .through the remainder of the term”. The notice sent to Day Enterprises indicated that the lack of attendance by Richard Day was the “more serious” of the specified deficiencies.
 

 It is stipulated that prior to receipt of the March 28, 1980 Notice of Nonrenewal and during the period from receipt of that notice to May 16, 1980, Richard Day was not personally present at the station forty hours per week and did not devote ninety percent of the time spent on all his business activities to the operation and management of his Crown station. Richard Day testified that during the relevant period prior to receipt of the March 28, 1980 letter, he was at the station between 16 and 20 hours per week, and that after receipt of the March 28,1980 letter and until April 21,1980, he was at the station between 25 and 30 hours per week, and spent much of his time painting the station in order to correct one of the deficiencies noted in the March 28, 1980 letter; namely, the appearance of his station.
 

 The parties have stipulated that Richard Day’s wife was in a hospital from April 21 — 25, 1980 for surgery to remove a tumor; that for approximately three to three and one-half weeks thereafter, Mrs. Day, though ambulatory, was unable to care for the Days’ three small children, the youngest of whom is an infant; and that Richard Day cared for the children during this time. Richard Day’s activities included preparing meals for his family and fulfilling his wife’s carpool obligation by driving his own and his neighbor’s children to and from school on certain days. On April 23, 1980, Richard Day advised Crown District Manager Daly that his responsibilities at home would increase.
 

 Richard Day and his wife testified that they chose not to hire a practical nurse or other person to care for their children, because they “did not want strangers to care for their children.” It is not disputed that the Days could have afforded to employ in their home competent child care service available in the community, but chose not to do so. The Days did not ask their parents or relatives to care for their children because their parents were too old and their relatives were “generally unavailable.” Neighbors offered to care and did care for the children on a few occasions. The Days did not seek greater assistance from their friends because they felt it would be an imposition. The court finds no adequate justification for their failure to employ someone to care for the children at least part time so that Richard Day could devote to his Crown station more than the very few hours a week he says he devoted.
 

 On May 28, 1980, Crown sent Day Enterprises a Notice of Termination and Withdrawal of Offer that informed plaintiff that Crown’s offer of a new dealer agreement made in the March 28, 1980 warning letter was being withdrawn and that Crown was terminating their franchise relationship pursuant to sections 102(b)(2)(A) and (B) of PMPA. Specifically, the May 28, 1980 termination notice stated that Richard Day had continued to violate the substantial full time provision and had failed to exert good faith efforts to comply with that provision. The notice further advised that Crown would permit Day Enterprises to remain in possession of the station until September 2, 1980 (ninety-four days after May 28, 1980) so that Day Enterprises would have the maximum period of notice to which it was arguably entitled under PMPA.
 

 
 *1290
 
 Day Enterprises argues that a Motor Fuel Inspection Regulation adopted by the Comptroller of the State of Maryland under the Motor Fuel Inspection Law, Art. 56, § 157
 
 et seq.,
 
 Ann. Code of Md. (1979 Repl. Vol.) renders the substantial full time provision of the dealer agreement unenforceable.
 

 The relevant provision of the Motor Fuel Inspection Law is Article 56, § 157E, which provides:
 

 [N]o producer or refiner of petroleum products shall operate a major brand, secondary brand, or unbranded retail service station in the State of Maryland, with company personnel, a subsidiary company, commissioned agent or under a contract with any person, firm, or corporation managing a service station on a fee arrangement with the producer or refiner. The station must be operated by a retail service station dealer.
 

 Pursuant to a grant of rulemaking authority under that statute, § 157B(a), the Comptroller promulgated a regulation in which the term “subsidiary” is defined, as follows:
 

 “Subsidiary” means a company 15 percent or more of the assets, capital stock, or voting securities of which are held directly or through attrition, by another company or a company which as a practical matter is controlled by another company.
 

 COMAR ,03.03.07.32A(2). Accompanying this definition of “subsidiary” is the following example of “practical control”:
 

 (5) Assume: Ajax Oil Company neither holds nor has pledged to it any of the assets of its retailers. Ajax requires, however, that its retailers: (1) operate no more than one station and (2) personally spend a specified number of hours per week in their respective stations (if the retailer is incorporated, the second requirement is demanded of the principal officer of the retailer corporation).
 

 Result: The Ajax retailers are subsidiaries of Ajax Oil Company because, as a practical matter, they are controlled by the Ajax Oil Company.
 

 COMAR ,03.03.07.32B(5).
 

 Day Enterprises argues that the effect of the substantial full time provision in its dealer agreement is to make Day Enterprises a “subsidiary” of Crown, as that term is defined in the Maryland regulations, quoted above, and that because it is unlawful under Maryland law for a subsidiary of a refiner of petroleum products to operate a retail service station,
 
 [2]
 
 the substantial full time provision is unenforceable.
 

 The Circuit Court for Anne Arundel County, Maryland has recently held that the Comptroller Regulations, particularly the regulation defining “subsidiary,” are (1) in excess of the legislative authority pursuant to which they were promulgated and are (2) void for vagueness.
 
 Crown Central Petroleum Corp. v. Goldstein,
 
 Equity No. 26,727, Cir.Ct. Anne Arundel County, Nov. 23,1981, slip op. at 21. This court, however, is not bound by the rulings of a lower state court, but must make its own determination after giving proper regard to relevant rulings of the state court.
 
 Commissioner v. Estate of Bosch,
 
 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).
 

 After considering the evidence and the arguments of the respective parties in the case at bar, this court concludes that the “substantial full time” provision in the dealer agreement involved in this case does not render Day Enterprises a “subsidiary” under Maryland law. Crown does not literally prohibit its dealers from operating other service stations. Indeed, in the substantial full time provision, quoted on pp. 1293-1294, above, Crown recognizes that a dealer may participate as a “proprietor, partner, employee, officer, director, stockholder, creditor or otherwise” in another service station or any other business.
 
 [3]
 
 Al
 
 *1291
 
 though the 90% requirement in the substantial full time provision limits the time a Crown dealer may devote to another station, a relatively small, independent refiner and marketer of petroleum products, such as Crown, which has adopted a highly competitive marketing, strategy in order to compete with major oil companies, has a valid interest in requiring that its dealers devote the principal portion of their business time to their Crown stations. The 90% time requirement does not amount to a prohibition of some participation in the ownership and operation of another station. Crown does not argue that Richard Day’s fifty percent ownership in Retail Petroleum Services, Inc., which operates two stations on Interstate 95 between Baltimore and the Delaware line, and of which Richard Day is vice-president and secretary, violates his agreement with Crown. Richard Day testified that he devoted less than three hours per week to Retail Petroleum Services, Inc. Crown does not contend that the slight participation by Day in the operation of those stations violates the dealer agreement; Crown does contend, correctly, that the time spent by Richard Day in connection with the operation of those stations should be considered in determining whether he devoted to the operation of his Crown station 90 percent of the aggregate time he devoted to all his business enterprises. It is not illegal under Maryland law for a company such as Crown to require that its dealers devote to their Crown stations 90 percent of the time they devote to business matters.
 

 Crown argues that its termination of the Day Enterprise franchise was authorized by § 102(b)(2)(A) and/or (B), and that it satisfied all thé procedural requirements of PMPA.
 

 Day Enterprises argues that when Crown sent the March 28, 1980 Notice of Nonrenewal, in which Crown warned Day Enterprises that its franchise might not be renewed unless,
 
 inter alia,
 
 Richard Day began to comply and complied with the substantial full time provision immediately and during the remainder of the term of the existing franchise, Crown not only: (1) waived its right to terminate the franchise under § 102(b)(2)(A) for pre-March 28, 1980 violations of the substantial full time provision; but also (2) waived its authority to terminate the franchise under § 102(b)(2)(A) for post-March 28, 1980 violations of the substantial full time provision and was required thereafter to give Day Enterprises a “reasonable opportunity” to exert “good faith efforts” pursuant to § 102(b)(2)(B) to cure the attendance problem.
 

 After considering the evidence and the arguments of counsel, this court finds and concludes that by sending Day Enterprises the March 28, 1980 letter, Crown did not waive its authority to terminate the Day Enterprises franchise pursuant to § 102(b)(2)(A) of PMPA for post-March 28, 1980 violations of the substantial full time provision. Section 102(a)(2)(B), set out in n.l, above, does not expressly or impliedly provide for the type of waiver for which Day Enterprises argues. Neither the legislative history nor the few cases interpreting PMPA indicate that a franchisor waives its authority to terminate a franchise under § 102(b)(2)(A) by sending a letter-warning similar to the one sent by Crown to Day Enterprises on March 28, 1980.
 
 [4]
 
 Moreover,
 
 *1292
 
 in the March 28, 1980 letter, Crown stated that its offer of a new dealer agreement might be withdrawn unless Richard Day began to comply and complied with the substantial full time provision “immediately . . . [and] through the remainder of the term.. . . ” Use of the word “immediately” in the letter indicates that Crown did not waive its authority to terminate the franchise under § 102(b)(2)(A) for a post-March 28, 1980 violation of the full time provision. Crown retained its authority to terminate the Day Enterprises franchise pursuant to § 102(b)(2)(A) for post March 28, 1980 violations of the substantial full time provision.
 

 Section 102(b)(2)(A) of PMPA provides that a franchisor may terminate or fail to renew a franchise for “failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship.” 15 U.S.C. § 2802(b)(2)(A). The parties have stipulated that the substantial full time provision is reasonable and of material significance to the franchise unless the Maryland regulation renders it unenforceable. This court finds that the substantial full time provision was not rendered unenforceable by the Maryland regulation.
 

 Section 102(b)(2)(B) of PMPA provides that a franchisor may terminate a franchise for the franchisee’s failure to “exert good faith efforts to carry out the provisions of the franchise” if the franchisee was “apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provision.”
 
 Id.
 
 § 2802(b)(2)(B).
 

 After considering the testimony of Richard Day and his wife at the hearing in this court, as well as the stipulations and the arguments of counsel, the court finds that Richard Day’s failure to comply with the substantial full time provision during the three week period between receipt of the March 28, 1980 letter and his wife’s entering the hospital on April 21, 1980 justified Crown’s termination of the Day Enterprises franchise pursuant to § 102(bX2)(A) of PMPA. The court also finds as a fact that Richard Day was not justified in his failure to comply with the substantial full time provision during the period after his wife’s one week hospitalization. Both of these findings support the court’s further findings that Richard Day failed to exert good faith efforts to carry out the provisions of the franchise agreement after receiving the March 28, 1980 warning letter, and that in light of Richard Day’s prior repeated violations of the substantial full time provision, Crown afforded Richard Day a reasonable opportunity after March 28, 1980, to exert good faith efforts to carry out the provisions of the franchise agreement.
 

 Day Enterprises argues that Crown’s termination pursuant to § 102(b)(2)(A) and (B) was not in accordance with the procedural requirements of PMPA. Prior to termination of a franchise, a franchisor must notify the franchisee of the termination in a writing either posted by certified mail or delivered by hand. 15
 
 *1293
 
 U.S.C. § 2804(a)(1), (c)(1) & (c)(2). The writing must contain a statement of the franchisor’s intention to terminate along with the reasons therefor, the effective date of termination and a summary of the franchisee’s rights under the PMPA.
 
 Id.
 
 § 2804(c)(3). Crown satisfied these requirements in the May 28, 1980 letter.
 

 Notice of termination must also be given at least ninety days before the “date on which termination or nonrenewal takes effect.”
 
 Id.
 
 § 2804(a)(2). Day Enterprises argues that PMPA required that notice be given ninety days before June 30, 1980, the expiration date specified in the dealer agreement. PMPA, however, requires that notice be given 90 days before the date on which termination is to “take effect,” not 90 days before the expiration date listed in the franchise agreement. 15 U.S.C. § 2804(a)(2); see,
 
 e.g., Ferriola v. Gulf Oil Corp.,
 
 496 F.Supp. 158, 161 (E.D.Pa.1980), affirmed without opinion, 649 F.2d 859 (3 Cir., 1981), and
 
 Kesselman v. Gulf Oil Corp.,
 
 479 F.Supp. 800 (E.D.Pa.1979), affirmed without opinion, 624 F.2d 1090 (3 Cir. 1980). In the case at bar Crown’s May 28, 1980 letter permitted Day Enterprises to hold over, without prejudice, until September 2, 1980, ninety-four days after the May 28, 1980 notice.
 
 [5]
 
 This court finds and concludes that the termination took effect on September 2, 1980, more than 90 days after the letter notice, and not on the expiration date listed in the dealer agreement, and that the notice was legally sufficient.
 

 Termination pursuant to § 102(b)(2)(A) requires that the franchisor must not have acquired actual or constructive knowledge of the violation(s) supporting its decision to terminate more than 120 days prior to the date on which notice is given, if 90 days notice was given. 15 U.S.C. § 2804(b)(1)(A). The relevant date of notification in this litigation is May 28, 1980.
 

 Day Enterprises argues that Crown had actual or constructive knowledge of Richard Day’s attendance problems more than 120 days prior to May 28, 1980,
 
 i.e.,
 
 prior to January 29,1980. This court agrees. However, the legislative history makes it clear that a new period begins to run with each new violation of the franchise agreement, even if the new violation is a “repeat occurrence” of a violation with respect to which a previous right of termination was waived. As the Senate Report stated:
 

 The time limitations are designed to provide adequate opportunity for a franchisor to evaluate a potential grounds (sic) for franchise termination or nonrenewal prior to making a determination whether to terminate the franchise or not to renew the franchise relationship. Flexibility is provided so that a franchisor may work with a franchisee in an effort to correct the situation and avoid termination of the franchise or non-renewal of the franchise relationship. If the franchisor waives the exercise of termination or non-renewal rights based upon a specific occurrence of an event, the franchisor may not thereafter base termination or non-renewal upon the specific occurrence. However, the time limitations are not intended to stop a franchisor from exercising termination or non-renewal rights based upon a future event which constitutes a ground for termination or non-renewal, even if such future event is a repeat occurrence of an event with respect to which the previous exercise of termination or non-renewal rights was waived.
 

 S.Rep.No.95-731, 95th Cong., 2d Sess. at 33-34,
 
 reprinted in,
 
 3 U.S.Code Cong.Ad. News 873, 892 (1978). Richard Day continued to violate the full time provision each week from December 1979 to at least May 16, 1980. The notice of termination was sent on May 28, 1980. Thus, Crown satisfied the requirements of § 104(b)(1)(A). See,
 
 e.g., Escobar v. Mobil Oil Corp.,
 
 522 F.Supp. 593, 602 (D.Conn.1981);
 
 Walters v. Chevron U.S.A., Inc.,
 
 476 F.Supp. 353, 357 (N.D.Ga.1979).
 

 
 *1294
 
 The court finds and concludes that Crown’s termination of the Day Enterprises franchise by the May 28, 1980 letter was justified by the facts and did not violate any federal or state law.
 

 Counsel should agree upon an appropriate judgment order giving effect to this decision. If counsel are unable to agree upon such a judgment order, the court will prepare and enter one promptly.
 

 [1]
 

 . Section 2802(b)(2) provides in pertinent part:
 

 For purposes of this subsection the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:
 

 (A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship, if the franchisor first acquired actual or constructive knowledge of such failure—
 

 (i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title, or
 

 (ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.
 

 (B) A failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise, if—
 

 (i) the franchisee was apprised by the franchisor in writing of such failure and was afforded a reasonable opportunity to exert good faith efforts to carry out such provisions; and
 

 (ii) such failure thereafter continued within the period which began not more than 180 days before the date notification of termination or nonrenewal was given pursuant to section 2804 of this title.
 

 Day Enterprises is a “franchisee” as that term is defined in PMPA. 15 U.S.C. § 2801(4). Crown is a “franchisor” as that term is defined in PMPA.
 
 Id.
 
 § 2801(3).
 

 [2]
 

 . See Article 56, § 157E, quoted in text, above. Article 56, § 157K provides criminal penalties for violation of the Motor Fuel Inspection Law.
 

 [3]
 

 . Crown does restrict its dealers from having any financial interest in another service station located within ten miles of the dealer’s Crown
 
 *1291
 
 station, but Crown does not contend that the provision was violated in this case.
 

 [4]
 

 . Day Enterprises relies on the following passage from the Senate Report as support for its position:
 

 Specific conditions are attached to each of these grounds, including time limitations which are imposed to preclude a franchisor from basing termination or nonrenewal upon old and long forgotten events. The time limitations are designed to provide adequate opportunity for a franchisor to evaluate a potential grounds (sic) for franchise termination or non-renewal prior to making a determination whether to terminate the franchise or non-renewal. If the franchisor waives the exercise of termination or non-renewal rights based upon a specific occurrence of an event, the franchisor may not thereafter base termination or non-renewal upon the specific occurrence. However, the time limitations are not intended to stop a franchisor from exercising termination or non-renewal rights based upon a future event which constitutes
 
 *1292
 
 a ground for termination or non-renewal even if such future event is a repeat occurrence of an event with respect to which the previous exercise of termination or non-renewal rights is waived.
 

 S.Rep.No.95-731, 95th Cong. 2d Sess. at 33-34,
 
 reprinted in,
 
 3 U.S.Code Cong.Ad.News 873, 892 (1978). The above paragraph concerns time limitations contained in PMPA, and the reference to “waiver” means waiver through failure of the franchisor to take action within those time limitations. See
 
 Walters v. Chevron U.S.A., Inc.,
 
 476 F.Supp. 353, 357 (N.D.Ga. 1979).
 

 Day Enterprises also cites the decision of Judge Young in
 
 Malone v. Crown Central Petroleum Corp.,
 
 474 F.Supp. 306 (D.Md.1979), as support for its position. In
 
 Malone,
 
 however, Judge Young did not address the issue of waiver, and held that Crown’s termination of the Malone franchise under either § 102(b)(2)(A) or (B), or both, was valid.
 
 Id.
 
 at 311; see Finch,
 
 Judicial Interpretation of the Petroleum Marketing Practices Act: Strict Construction of Remedial Legislation,
 
 37 Bus.Lawyer 141, 152-53 (1981).
 

 [5]
 

 . Crown stated in its May 28, 1980 notice that this “hold over” period was given to Day Enterprises “to allow for the maximum notice period provided by the [PMPA].”