**SHELL OIL COMPANY, Plaintiff,**

v.

**Jack KOZUB, Defendant.**

**Civ. A. No. C83–794.**

United States District Court,
N.D. Ohio, E.D.

Nov. 7, 1983.

---

**3.** We need not here discuss our original reasons for granting the writ, which were detailed in our first, unpublished, opinion in this matter. This is beyond the scope of the question which the Second Circuit directed us to consider.

Randall L. Solomon, Cleveland, Ohio, Stephen D. Long, Houston, Tex., for plaintiff.

Stephen P. Kolozvary, Julius E. Kovacs, Cleveland, Ohio, for defendant.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Shell Oil Company ("Shell") brings this action to terminate the franchise under which defendant Jack Kozub operates a Shell service station in Brecksville, Ohio. Pending before the Court are Shell's Motion for Summary Judgment and Kozub's Motion for a Preliminary Injunction permitting him to retain the franchise until a final judgment is entered. For the reasons set forth below, the Motion for Summary Judgment is granted and the Motion for a Preliminary Injunction is denied.

The Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801–2806, governs this dispute. Jurisdiction rests on 28 U.S.C. §§ 1331, 1337.

### FACTS

Shell, a Delaware corporation with its principal place of business in Houston, Texas, refines crude oil into gasoline and other petroleum products, which it sells throughout the world. Shell is authorized to do business in Ohio.

On August 30, 1979, Shell entered into a Motor Fuel Station Lease granting Jack Kozub the right to operate a Shell station at 8952 Brecksville Road, Brecksville, Ohio until September 30, 1982. Under a concurrently executed Dealer Agreement, Shell agreed to sell Kozub gasoline and authorized him to use the Shell trademark, trade name, and other brand identifications. On April 21, 1982, both the lease and agreement were extended from October 1, 1982 to September 30, 1985.

Shell and Kozub also entered into a Reseller Letter of Agreement ("Reseller Letter"), permitting Kozub to accept payment from his customers through bank credit cards, Visa and Mastercard, and agreed to the terms of the Shell Credit Card Sales Guide ("Sales Guide"), which governed the use of Shell's own credit card. A second Reseller Letter was executed on July 21, 1982.

Under the various contracts, a franchisee must pay for gasoline sold to him at the time of delivery by either (1) a money order, certified check, or cashier's check, or (2) valid bank card or Shell credit card invoices received from customers.

Shell refuses to permit its dealers to buy gasoline with their personal credit cards. The Reseller Letters of 1979 and 1982, at 2, ¶ 6, state in identical language:

> ... By your endorsement and delivery to us [Shell] of any Sales Draft you represent and warrant that it represents an obligation of a Bank Card user in the amount set forth on the Draft, not subject to any dispute, offset, or counterclaim, and that it was drawn on a purchaser to whom you sold products or rendered services in good faith pursuant to a Bank Card in good standing and valid on its face.

Likewise, the Sales Guide, at 3, states:

> Dealers and jobbers will not receive credit from Shell for any credit card invoices which represent:
> ...—Charges made at the dealer's station with the dealer's personal credit card.

On at least fifteen occasions between March and October of 1982, Kozub attempted to pay for gasoline deliveries by submitting invoices drawn on his personal Visa and Mastercard accounts. The purchase amounts ranged from $350 to $995 and totalled more than $10,000. Although approval from the Bank Card Authorization Center is required for all sales exceeding $50, Kozub submitted card invoices that had not been approved and that contained other deficiencies. As a result, the sponsoring banks refused to honor the charges. When Shell discovered the non-payments in December, it confronted Kozub and he paid the amounts requested.

Kozub does not dispute that he used the cards in the manner described or that as a consequence he had interest-free use of thousands of dollars for months between the deliveries and his eventual payments to Shell. In an affidavit, Kozub states that he did not believe that he was violating his agreements with Shell and that he expected his banks to honor the invoices. Shell submits a contrary affidavit from its territory manager, Stephen L. Merritt, who states that Kozub told him in December of 1982 that he knew he could not pay for gasoline with the bank cards, but did so nonetheless because he lacked funds to pay for the fuel. Kozub denies making such a statement.

On January 7, 1983, Shell sent a letter to Kozub notifying him that his franchise was to be terminated effective April 16. The stated grounds were fraud, failure to pay for gasoline in timely fashion, and failure to comply with the Dealer Agreement. When Kozub refused to surrender the station, Shell commenced this action. On May 2, the parties submitted a stipulation under which Shell permitted Kozub to continue operating the station pending the Court's ruling on the Motion for a Preliminary Injunction.

## LAW

One purpose of the PMPA was to shield "franchisees from arbitrary or discriminatory termination or non-renewal of their franchises." S.Rep. No. 95–731, 95th Cong., 2d Sess. 15, *reprinted in* [1978] U.S.Code Cong. & Admin.News 873, 874. Since franchisors not only grant trademark licenses and supply products but also lease the service station premises, Congress sought to ameliorate the vast disparity in bargaining power between huge oil corporations and individual station operators. *Id.* at 873–77. The PMPA acknowledges and protects the concerns of franchisees and the right of franchisors to terminate

franchises under certain circumstances. *Humboldt Oil Company, Inc. v. Exxon Co., U.S.A.*, 695 F.2d 386, 388 (9th Cir. 1982); *Di Napoli v. Exxon Corp.*, 549 F.Supp. 449, 450 (D.N.J.1982). It prohibits termination of any franchise except when the franchisee committed a specifically enumerated infraction. 15 U.S.C. § 2802(b) and (c). Franchisees may seek injunctions halting unjustified terminations under 15 U.S.C. § 2805.

The different standards for preliminary injunctions and summary judgments require that the claims of Shell and Kozub, which admittedly involve many of the same facts and issues, must be treated separately. Since a grant of summary judgment would render a preliminary injunction moot, the Court considers summary judgment first.

15 U.S.C. § 2802(b)(1) sets two conditions for terminating a franchise:

Any franchisor may terminate any franchise ... if—

(A) the notification requirements of section 2804 of this title are met; and

(B) such termination is based on a ground described in [section 2802(b)(2) ].

Section 2802(a)(2) requires that notice be given ninety days before the termination date. It is not disputed that the letter, mailed January 7, 1983, was received by Kozub on January 15, 1983, providing more than ninety days notice of the April 16 termination.

Shell alleges that several provisions of § 2802(b) gave it adequate grounds to terminate Kozub's franchise. Section 2802(b)(2)(A) permits termination following "[a] failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship ..." Similarly, § 2802(b)(2)(C) allows termination after "[t]he occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise ... is reasonable ..." Section 2802(c) lists "events" which constitute "relevant" and "reasonable"

grounds for termination. Two such events are:

(1) fraud or criminal misconduct by the franchisee relevant to the operation of the marketing premises;

.    .    .    .    .

(8) failure by the franchisee to pay the franchisor in a timely manner when due all sums to which the franchisor is legally entitled ...

■ Since intent to mislead is an essential element of fraud under Ohio law and Kozub's intent is a disputed factual issue, summary judgment on that ground is inappropriate. Shell therefore must show that Kozub (1) violated a material and reasonable provision of the franchise contract under § 2802(b)(2)(A), or (2) failed to pay Shell amounts owed in a timely manner under § 2802(b)(2)(C) and (c)(8).

The clear language of the PMPA and the extensive case law that has developed since it became effective in 1978 provide ample proof that Kozub's use of personal credit cards to pay for gasoline, in violation of the Reseller Letters, constituted a failure to comply with a franchise contract provision that "is both reasonable and of material significance to the franchise relationship ..." Among the service station lease violations that courts have found to be adequate grounds for termination are failure to keep the station open full time, *Day Enterprises, Inc. v. Crown Central Petroleum Corporation*, 529 F.Supp. 1291, 1298 (D.Md.1982); *Crown Central Petroleum Corporation v. Waldman*, 515 F.Supp. 477, 486 (M.D.Pa.1981), failure to maintain reasonable standards of cleanliness and appearance, *Weisenburger v. Amoco Oil Company*, 534 F.Supp. 673, 675–76 (D.N.D. 1982); *Walters v. Chevron U.S.A., Inc.*, 476 F.Supp. 353, 356 (N.D.Ga.1979), *aff'd*, 615 F.2d 1135 (5th Cir.1980), failure to meet minimum gasoline purchase requirements, *Malone v. Crown Central Petroleum Corporation*, 474 F.Supp. 306, 311–12 (D.Md. 1979), failure to make timely rental payments, *Kajdan v. Exxon Co., U.S.A.*, [1980–1] Trade Reg. Rep. (CCH) ¶ 63,252,

at 78,303 (D.Conn.1980), and death of the franchisee. *Lanham v. Amoco Oil Company*, 481 F.Supp. 405, 406 (D.Md.1979).

 The Court finds that a contract provision governing the means by which franchisee Kozub was to pay Shell for gasoline is as material as provisions governing station hours, cleanliness, purchase requirements and rental payments. Accordingly, the Court finds that Kozub's use of personal Visa and Mastercard cards to pay for gasoline in violation of the Reseller Letters provides Shell with a sufficient basis for terminating the franchise under § 2802(b)(2)(A).

 Since Kozub's use of his bank cards enabled him to avoid paying for gasoline for many months after he had obtained and sold it, the Court also finds that termination was justified under § 2802(b)(2)(C). Regardless of whether his intent was innocent or malignant, Kozub's activities constituted a "failure ... to pay the franchisor in a timely manner when due all sums to which the franchisor is legally entitled," § 2802(c)(8), a "relevant" occurrence making termination "reasonable" under § 2802(b)(2)(C). His subsequent payment, on demand, of the overdue funds does not remedy the persistent pattern of non-payment for the better part of a year.

The Court concludes that the undisputed facts of this case render Shell's termination of the franchise permissible under the PMPA and clearly authorized by the terms of the lease and the statute. Summary judgment for Shell is therefore proper. Kozub's Motion for a Preliminary Injunction is denied as moot.

However, while there is nothing in the PMPA which prohibits Shell from terminating its relationship with Kozub, neither is there necessarily anything praiseworthy in its decision to abandon a franchisee who has served it for four years. The breaches of contract committed by Kozub were not, as he asserts, minor and insignificant, but they were confined to a single aspect of the relationship and were rectified when Shell demanded payment.

Judgment must be entered for the plaintiff. The parties are ordered to submit by November 25, 1983 an appropriate order giving effect to this decision. If counsel are unable to agree on the terms of such an order, the Court will take appropriate action to enforce the judgment entered herein.

IT IS SO ORDERED.