## COMPTROLLER OF THE TREASURY *v.* CROWN CENTRAL PETROLEUM CORPORATION

[No. 4, September Term, 1982.]

*Decided October 19, 1982.*

The cause was argued before MOORE, WILNER and GARRITY, JJ.

*Charles O. Monk, II, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Michael F. Brockmeyer, Assistant Attorney General,* and *Gerald Langbaum, Assistant Attorney General,* on the brief, for appellant.

*Morton A Sacks* and *Philip D. Hale,* with whom were *Ray R. Fidler* and *Cable, McDaniel, Bowie & Bond* and *Bald & Hale* on the brief, for appellee.

*Amicus curiae* brief of The Greater Washington/Maryland Service Station Association filed. *Peter H. Gunst, Linda M. Richards, Frank, Bernstein, Conaway & Goldman, Thomas M. Wilson, III* and *Tydings & Rosenberg* on the brief.

WILNER, J., delivered the opinion of the Court. GARRITY, J., filed a dissenting opinion at page 598 *infra.*

In an action brought against the Comptroller of the Treasury (Comptroller) by Crown Central Petroleum Corporation (Crown), the Circuit Court for Anne Arundel County entered a summary judgment declaring that (1) certain regulations promulgated by the Comptroller under the purported authority of Md. Code art. 56, § 157B were invalid, and (2) the contractual relationship between Crown and its service station dealers as disclosed by the evidence presented to the court was not unlawful. The Comptroller appeals both aspects of that judgment.

The dispute with respect to the Comptroller's regulations is but the latest phase of a deeper controversy over the State's attempt to regulate the marketing of petroleum products within its borders — a controversy that has already produced two cases in the Court of Appeals and one in the

Supreme Court of the United States. Some background would therefore be helpful in understanding the issues presented here in their proper context.

In 1973, the General Assembly declared that "since the distribution and sale through marketing arrangements of petroleum products in the State of Maryland vitally affect the economy of the State, the public interest, welfare, and transportation, it is necessary to define the relationships and responsibilities of the parties to certain agreements pertaining thereto." It attempted to define those relationships and responsibilities by enacting the "Maryland Gasoline Products Marketing Act" (Acts of 1973, ch. 662, then codified as Md. Code art. 23, § 167A, *et seq.,* now codified as Commercial Law article, § 11-301, *et seq.*).

The 1973 law addressed what the General Assembly evidently saw as an imbalance of economic power between the oil companies and their dealers that it believed was detrimental to the State and in need of redress. The law required the oil companies to disclose certain information to prospective service station dealers before entering into marketing agreements with them; it precluded certain requirements and restrictions onerous to the dealers from being inserted in those marketing agreements; and it imposed certain requirements and restrictions upon the termination of the agreements.[1] One of the protections afforded in the 1973 law was that a dealer "shall not be required to keep his retail outlet open for business for any specified number of hours per day, or days per week, unless his marketing agreement expressly sets forth the requirements."

---

1. The 1973 Act spoke to the relationship between "distributors" and "dealers." A "distributor" was defined as "any person engaged in the sale, consignment, or distribution of gasoline products through retail outlets which it owns or leases, and who maintains a written contractual relationship with a dealer for the sale of the products, *and shall include any subsidiary or affiliated corporation in which it holds at least thirty percent voting control.*" (Emphasis supplied.) A "dealer" was defined as "any person engaged in the retail sale of gasoline products under a marketing agreement entered into with a distributor, *other than a person who is an employee of a distributor.*" (Emphasis supplied). The terms "marketing agreement" and "engaged in the retail sale of gasoline products" were also defined in the law.

In 1974, the General Assembly enacted two bills affecting the retail marketing of petroleum products. Chapter 852 amended the 1973 Gasoline Products Marketing Act by (1) closing a potential "loophole" in the definition of "distributor"; (2) forbidding distributors from unreasonably refusing to renew a marketing agreement; and (3) requiring distributors, upon termination of a marketing agreement for any reason other than material breach by the dealer, to pay the dealer the value of any "business goodwill enjoyed by the dealer" at that time.

The second act passed in 1974 is more at the root of the present controversy. Chapter 854 — commonly known as the "divestiture" law — was for the stated purpose of "prohibiting producers or refiners of petroleum products from operating retail service stations." The legislative history of Chapter 854 and the intent of the General Assembly in enacting it are described in some detail in *Governor of Maryland v. Exxon Corp.,* 279 Md. 410 (1977), *aff'd* 437 U.S. 117, *reh. den,* 439 U.S. 884 (1978). In summary, the legislature was reacting to what it perceived as a growing and harmful trend toward vertical integration in the marketing of petroleum products. Evidence was presented to the legislature that the oil companies had begun to change their marketing strategies, that they were beginning to favor stations owned and operated directly by them, with their employees, in lieu of the more traditional dealer-operated stations, and that, in furtherance of that policy, they discriminated against dealer-owned or operated stations in the allocation of product and in various pricing policies.

Chapter 854 had a dual thrust. Three of its subsections prohibited discrimination in allocation and pricing among the service station dealers. Two others — the divestiture provisions — prohibited the oil companies from "operat[ing] a major brand, secondary brand, or unbranded retail service station in the State of Maryland, with company personnel, a subsidiary company, or a commissioned agent" after July 1, 1975, and from opening any additional such stations after July 1, 1974. The Comptroller was authorized to adopt rules defining the circumstances in which a producer or refiner

could temporarily operate "a previously dealer-operated station" and to permit "reasonable exceptions to the divestiture dates."

These provisions enacted by Ch. 854 were added not to the Gasoline Products Marketing Act but rather to the Motor Fuel Inspection Law, codified in Md. Code art. 56, § 157A, *et seq.* That law, as it then stood, was not concerned so much with the economic relationships between the oil companies and their dealers as with assuring that petroleum products sold to the public were properly graded and priced. It permitted the Comptroller to establish minimum specifications for the various gasoline and motor fuel products marketed in the State, required virtually all persons in the production and marketing chain to register with the Comptroller, gave the Comptroller the right to enter the premises of these registrants to inspect petroleum products stored there, required all substitutes or "improvers" of fuel products to be submitted to the Comptroller for approval, and established certain requirements for gasoline pumps and advertising placards at the service stations. In that general context, § 157B (a) of art. 56 provided, in part:

> "The Comptroller of the Treasury is hereby authorized and required to administer the provisions of this subtitle. For this purpose, he shall have the power to promulgate such rules and regulations as may be necessary for the proper administration and enforcement of this subtitle."

In February, 1975, the Comptroller proposed a number of "Motor Fuel Inspection Regulations" under Ch. 854, *See* 2:4 Md.Reg. 228 (2/19/75). They dealt primarily with the "temporary" operation of service stations by producers and refiners and with procedures for obtaining exceptions to the mandatory divestiture dates, however, and did not attempt to define such terms as "company personnel" or "subsidiary company."

The 1975 session of the General Assembly produced two additional pieces of legislation. Chapter 624, Acts of 1975,

amended a provision of the Gasoline Products Marketing Act. As introduced, it would have flatly prohibited a distributor from requiring a dealer to keep his station open for any specified number of hours per day or days per week; as enacted, it permitted such a requirement if "negotiated in good faith by both parties and arrived at in mutual agreement and is on the basis of a bona fide business need."

The second enactment — Chapter 608, Acts of 1975 — amended the 1974 additions to the Motor Fuel Inspection Act to prohibit producers and refiners from using persons employed on a "fee arrangement" to operate service stations. The Legislature declared that "[t]he station must be operated by a retail service station dealer." With that amendment, § 157E (c) of art. 56 read as follows:

> "After July 1, 1975, no producer or refiner of petroleum products shall operate a major brand, secondary brand, or unbranded retail service station in the State of Maryland, with company personnel, a subsidiary company, commissioned agent, or under a contract with any person, firm, or corporation managing a service station on a fee arrangement with the producer or refiner. The station must be operated by a retail service station dealer."

The 1974 and 1975 additions to the Motor Fuel Inspection Law were placed in a form of suspended animation when a number of oil companies filed suit to declare them unconstitutional. The divestiture dates were, in effect, delayed first until August, 1977 (4:15 Md.Reg. 1145 (7/20/77)), and ultimately until July, 1979.

Meanwhile, during the pendency of the litigation in the Court of Appeals (*Governor of Maryland v. Exxon Corp., supra,* 279 Md. 410) and the Supreme Court (*Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, *reh. den.* 439 U.S. 884 (1978)), several attempts were made in the General Assembly to amend the Gasoline Products Marketing Act in order to flatly prohibit distributors from requiring dealers to keep their stations open for any minimum number of hours or

days and to void any provision in a marketing agreement establishing such minima. Each of these attempts failed and no such legislation was enacted.[2]

On January 26, 1979, the Comptroller proposed a new, and much more comprehensive, set of regulations for the administration of the "divestiture" provisions of art. 56, § 157E. (6:2 Md.Reg. 76 (1/26/79)). Unlike the earlier proposed regulations, these sought, for the first time, to define some of the terms used but not defined in the statute. The new regulations were considered by the General Assembly's Joint Standing Committee on Administrative Executive and Legislative Review at three hearings in March, 1979; they were subsequently amended by the Comptroller and adopted. As a result of certain litigation contesting the validity of those regulations, however, the Comptroller again proposed amendments (7:21 Md.Reg. 1996 (10/17/80)), which, on December 2, 1980, were finally adopted (7:25 Md.Reg. 2332 (11/12/80)) and codified as COMAR 03.03.07.32. Those are the regulations here at issue.

The controversy centers on the definitions of "subsidiary" and "company personnel" and on certain "examples" or "principles" which the Comptroller proposes to use in determining whether the contractual arrangements under which retail service stations are operated are in conformance with the law. In particular, Crown objects to:

(1) Regulation 03.03.07.32A (1) defining "company" as "a sole proprietorship, partnership, corporation, or other business entity";

(2) Regulation 03.03.07.32A (2) defining "subsidiary" as

"a company which has more than 50 percent of its assets, capital stock, or voting securities held directly or through attribution by another company *or which as a practical matter is controlled by an-*

---

**2.** *See* SB 249 (1976) and SB 5 (1977), which passed the Senate but not the House of Delegates, and SB 27 (1978), which never emerged from the Senate Economic Affairs Committee.

*other company.* Practical control shall be presumed to exist if 15 percent or more of the assets, capital stock, or voting securities of a company are held directly or through attribution by another company" (emphasis supplied.);

(3) Regulation 03.03.07.32A (7) defining "company personnel" as "one or more employees, servants, or agents of a producer, a refiner, *or a subsidiary of a producer or refiner"* (emphasis supplied);

(4) Regulation 03.03.07.32B (5) and (6), as follows:

"In determining whether Subsection (b) or (c) of Article 56, § 157E, Annotated Code of Maryland, has been violated, the Comptroller will be guided by the principles set forth in the examples in this section:

\* \* \*

(5) Assume: Ajax Oil Company neither holds nor has pledged to it any of the assets of its retailers. Ajax requires, however, that its retailers: (1) operate no more than one station and (2) personally spend a specified number of hours a week in their respective stations (if the retailer is incorporated, the second requirement is demanded of the principal officer of the retailer corporation).

Result: *Those Ajax retailers who are noncorporate entities are company personnel of Ajax Oil Company and those Ajax retailers who are corporate entities are subsidiaries of Ajax Oil Company because Ajax Oil Company controls the Ajax retailers.*

(6) Assume: Ajax Oil Company neither holds nor has pledged to it any of the assets of its retailers. Ajax Oil Company, however, negotiated with its dealers pursuant to Commercial Law Article, § 11-304 Annotated Code of Maryland, agreements

requiring its retailers to operate their respective stations a specified number of hours per week. No other requirement inconsistent with the requirement that the Ajax retailers be independent dealers is imposed by Ajax upon its retailers.

Result: The Ajax retailers are neither company personnel nor subsidiaries of Ajax Oil Company." (Emphasis supplied.)

A comparison of subparagraphs (5) and (6) makes evident that, although the requirement that a station remain open a minimum number of hours per week will not, alone, suffice to establish "practical control" and thus make the dealer a subsidiary of the refiner, that result will obtain if, in addition to such a requirement, the dealer is precluded from operating more than one station.

The "Branded Service Station Lease And Dealer Agreement" regularly used by Crown requires the station to remain open twenty-four hours a day, seven days a week. That is a basic tenet of Crown's marketing strategy. The Agreement also contains the following provision:

"Dealer shall devote substantially his full time exclusively to the operation of the Station. 'Substantial full time' shall mean *both (i) personal attendance at the Station not less than forty (40) hours per week* exclusive of absence during period of illness or for reasonable vacation periods *plus* (ii) in the event the Dealer has any direct or indirect interest, either as a proprietor, partner, employee, officer, director, stockholder, creditor or otherwise in any business enterprise other than the Station, *performance of services in the management and operation of the Station for at least ninety percent (90%) of the aggregate time spent by the Dealer in performance of services of any type* (whether with or without compensation) for all business enterprises, including the Station, in which the Dealer has such an interest. . . ." (Emphasis supplied.)

Crown perceived — correctly, considering the position taken by the Comptroller in this litigation — that (1) its requirement that the dealer devote at least 90% of his business time to the service station if he has other business interests would be regarded as tantamount to a prohibition against his operating more than one station; and (2) as a result, when coupled with the requirement that the station remain open all the time, the Comptroller would, under Regulation 03.03.07.32B (5), consider the dealer to be either an employee or a subsidiary of Crown (depending on whether the dealer was incorporated) and thus regard the arrangement as a violation of the "divestiture" requirements of art. 56, § 157E.

Aware that a violation of "any provision" of the Motor Fuel Inspection Law, which presumably would include § 157E, was a misdemeanor subjecting the offender to fine and imprisonment (see art. 56, § 157K), Crown attacked the regulations as being (1) in excess of the Comptroller's statutory authority, (2) void for vagueness, and (3) inconsistent with the provision of the Gasoline Products Marketing Act (Commercial Law article, § 11-304) permitting a marketing agreement requirement that stations remain open a minimum number of hours if that requirement was negotiated in good faith on the basis of a bona fide business need. As an alternative, it claimed that if the regulations were indeed authorized by statute, the statute itself was invalid as constituting an improper delegation of legislative authority without adequate guidelines.

The circuit court acted on Crown's motion for summary judgment. It found that the regulations were in excess of the Comptroller's statutory authority, primarily on the basis that the use of "practical control" as a standard in defining "subsidiary" was not warranted by the statute. In light of that conclusion, the court declined to address the question of whether the underlying statutory delegation was proper. It did, however, consider the "due process" issue and declared the definition of "subsidiary" not only to be legislatively unauthorized but also impermissibly vague and thus unconstitutional. The court did not actually decide whether

the regulations conflicted with the Gasoline Products Marketing Act, but indicated through *dicta* its belief that no such conflict existed. Its decree stated:

"1. COMAR 03.03.07.32A (2) of the Regulations, insofar as it defines 'subsidiary' as meaning a company which as a practical matter is controlled by another company, is illegal and invalid as being in excess of the authority granted the Comptroller under Section 157B (a) of Article 56, Annotated Code of Maryland and in violation of Amendment XIV of the Constitution of the United States and Article 23 of the Maryland Declaration of Rights, by reason of its impermissible vagueness.

2. Operation of a Crown service station pursuant to the 1978 or 1979 Lease Agreement (Plaintiff's Exhibits 1 and 2) by an independent service station dealer which is not otherwise a subsidiary company within the meaning of Section 157E (b) or (c) of Article 56, Annotated Code of Maryland, is not operation by Crown of such service station with company personnel, a subsidiary company, commissioned agent, or under a contract with any person, firm or corporation managing a service station on a fee arrangement."

### (1) *Legislative Authorization*

Section 157E of art. 56 precludes a producer or refiner, such as Crown, from operating its service stations with "company personnel" or with a "subsidiary company." It requires that "[t]he station must be operated by a retail service station dealer." As we have noted, the law itself does not define the critical terms.

The Comptroller has not attempted, directly, to define the statutory term "subsidiary company." Rather, he has split the term into its components, converted the adjective "subsidiary" into a noun, given each component an expansive meaning (defining "subsidiary" in terms of control "as a

practical matter" without regard to equity ownership and defining "company" as including individuals and other non-corporate entities), and then reassembled the expanded components in his guidelines or "principles." It is only through that metamorphosis that he is able to regard Crown's dealers as either "company personnel" or "subsidiary companies."

The Comptroller seeks to justify both the process and the end result of it on two bases. First, he says, relying primarily upon an affidavit of one of his employees (Arthur E. Price, Administrator of Motor Fuel Inspection and Testing), that such an expanded reach is consistent with the intent of the law. The divestiture provisions, he claims, were intended to permit only "independent" dealers to operate service stations, to "eliminate producer or refiner control over retail gasoline marketing," and to preclude the kind of "complete economic dominance" over dealers by producers and refiners that would allow the latter to do indirectly what they could not do directly. Second, he argues that his definition of "subsidiary" in terms of "practical control" finds support in other Federal and State regulatory statutes and that the divestiture law ought to be read in the same way.

We are unable to accept either approach under the facts of this case.

We do not view the purpose of § 157E in quite the broad fashion that Mr. Price or the Comptroller do. The clear function of the divestiture provisions of § 157E was to prevent the continued operation of retail service stations by refiners and producers, and to require instead that such stations be operated by dealers on a contractual basis. *See Cities Service Company v. Governor of Maryland,* 290 Md. 553, 573 (1981). Nowhere in § 157E, or in any other part of the Motor Fuel Inspection Law, however, is there evident any intent by the Legislature to dictate the terms of such a contractual relationship or to adjust by legal fiat the bargaining status of either of the contracting parties. To the extent that the contractual or economic relationships between oil companies and their dealers are statutorily reg-

ulated by the State, the regulation emanates from the Gasoline Products Marketing Act, not the Motor Fuel Inspection Law. It is *there,* in the Marketing Act, that the Legislature has sought to redress such imbalance and unfairness as it found to exist.

As we have said, the General Assembly used the composite term "subsidiary company," but did not define the term. The normal rule of statutory construction is that when a statute uses a term but does not define it, the term is to be given "its ordinary and commonly-accepted meaning." *Scoville Service, Inc. v. Comptroller of the Treasury,* 269 Md. 390, 395 (1973); *Weaver v. Prince George's County,* 281 Md. 349, 365 (1977).

The standard dictionaries define "subsidiary company" in a corporate context as "a company wholly controlled by another that owns more than half of its voting stock" (Webster's Third New International Dictionary), "a company controlled by another company which owns most of its shares" (Webster's New Twentieth Century Dictionary Unabridged). We are unaware of any judicial construction of the term "subsidiary company"; however the term "subsidiary corporation" has been generally defined as "one which is controlled by another corporation by reason of the latter's ownership of at least a majority of the shares of the capital stock." *Rimes v. Club Corporation of America,* 542 S.W.2d 909, 912 (Tex.Civ.App. 1976); *see Fairbanks Morse & Co. v. District Court,* 247 N.W. 203, 207 (Iowa 1933); *cf. Baker v. Fenley,* 128 S.W.2d 295, 298 (Mo.App. 1939). Black's Law Dictionary (5th ed. 1979) takes the same approach, defining "subsidiary corporation" as "one in which another corporation (i.e., parent) owns at least a majority of the shares, and thus has control. Said of a company more than 50 percent of whose voting stock is owned by another." *See also* Ballantine's Law Dictionary (3d ed. 1969) definition of "subsidiary."

Whether the noun is "company" or "corporation," the definition is uniformly expressed in terms of control of *ownership,* or, at the very least, of dominance in directing the internal affairs and management of the entity. No court

or dictionary, to our knowledge, has considered one company to be the subsidiary of another merely because of an external contractual relationship between the two, even if that relationship were influenced by or was the product of unequal bargaining strengths.

The Comptroller, in response, points to a number of instances in which the term "subsidiary" has been statutorily defined in other ways, or in which something less than ownership of a majority of the voting shares will suffice to establish "control" of a company.[3] This hardly proves his case, however. It shows, at best, that when a legislative body desires to depart from the common meaning of "subsidiary company" or "subsidiary corporation" and utilize instead a criterion of "practical control" or anything less than majority ownership, it says as much in the statute. Indeed, that is precisely what the Maryland General Assembly did in the

---

3. In particular, the Comptroller refers us to 12 U.S.C. § 1730a(a) (1) (H) where, as part of the laws relating to Federal Savings and Loan insurance, "subsidiary" of a person is defined as "any company which is controlled by such person. . ."; 12 U.S.C. §§ 1841 (d) and 3101 (13) where, as part of the laws on bank holding companies and foreign bank participation in domestic markets, "subsidiary" is defined as

"(1) any company 25 per centum or more of whose shares (excluding shares owned by the United States or by any company wholly owned by the United States) is directly or indirectly owned or controlled by such bank holding company, or is held by it with power to vote; (2) any company the election of a majority of whose directors is controlled in any manner by such bank holding company; or (3) any company with respect to the management or policies of which such bank holding company has the power, directly or indirectly, to exercise a controlling influence, as determined by the Board, after notice and opportunity for hearing";

26 U.S.C. § 425 (f) where, for purposes of the tax laws relating to stock options, "subsidiary corporation" is defined as

"any corporation (other than the employer corporation) in an unbroken chain of corporations beginning with the employer corporation if, at the time of the granting of the option, each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50 percent or more of the total combined voting power of all classes of stock in one of the other corporations in such chain";

and 46 U.S.C. § 883-1 where, for purposes of the Merchant Marine Act, the term "subsidiary" means "a corporation not less than 50 per centum of the voting stock of which is controlled, directly or indirectly, by such corporation or its parent."

Gasoline Marketing Products Act (*see* footnote 1, *ante*), when it appeared to regard as an *alter ego* of a distributor another company in which the distributor holds "at least thirty percent voting control." The special definition is what signifies, and justifies, a departure from the common meaning.

This is not to say, however, that the concept of "practical control" is an entirely irrelevant one. It is a question of context and degree. What is it that a refiner must have "practical control" over, and how much "practical control" must the refiner have in order for the dealer properly to be regarded as the refiner's subsidiary?

If a refiner were to obtain "practical control" over a dealer's capital stock, through a voting trust or some similar arrangement, a parent-subsidiary relationship could well be found even in the absence of any ownership of that stock by the refiner. The "practical control" in that setting would be the equivalent of ownership in that it would permit the refiner to direct both the internal and external affairs of the dealer. The dealer in that situation would be a totally captive entity without any semblance of independence; and that is what the divestiture law was designed to preclude.

When the alleged "practical control" arises solely from an external contractual relationship, however, the law necessarily requires some greater circumspection. Every contractual relationship connotes some degree of "practical control" by one party over the other. It is the essence of the consideration required to support a contract: if $A$ promises $B$ to do X in return for Y, in enforcing that promise, $B$ has the power to exert some "practical control" over $A$. That does not, of course, necessarily make $A$ the subsidiary of $B$. Similarly, assuming an *a priori* freedom on the part of $A$ to enter or not to enter a contractual relationship with $B$, the mere fact that $B$ is in a superior bargaining position and thus able to dictate more than $A$ the terms of the agreement does not necessarily give $B$ the kind of "practical control" over $A$ sufficient to create a parent-subsidiary relationship.

The divestiture law does not address this situation at all.

As noted, the Legislature very carefully chose the Gasoline Products Marketing Act as its device for redressing any unfairness in the marketing agreements between distributors and dealers. Still, we may conceive of situations in which, through the device of an external contract freely entered into, a refiner can achieve such a degree of control over the internal management of a dealer as to render the purportedly external relationship a sham. A contract, for example, which permitted the refiner to dictate the dealer's hiring practices, pay scales, pricing policies, profit allocation, and the like could not reasonably be regarded as leaving the dealer with a separate and independent status. In that event, it would be appropriate for the Comptroller, in carrying out his responsibilities under the law, to recognize the situation for what it is.

We do not have that situation here, however, or anything akin to it, and therein lies the problem. The Comptroller, in his regulations, has extended his concept of "subsidiary through practical control" to a contractual setting which clearly is not a sham. Quite simply, the Comptroller, through this maze of definitions and "principles" has decreed by regulation that refiners may not require their dealers to devote a major part of their time to a single dealership. We find no warrant for such a decree in the underlying statute. That aspect of the regulation goes well beyond the administration of the divestiture law, and represents, instead, an attempt, through the guise of that law, to regulate an external contractual relationship between legally separate and independent entities.

This case does not require us to determine the ultimate permissible scope of an administrative definition of "subsidiary," much less to fashion such a definition by judicial fiat. As we have said, the use of a "practical control" standard in determining whether a dealer is effectively owned or managed by a producer/refiner *may* be justified in a more limited context. We therefore do not reject it out of hand, as the circuit court decree seemed to do.

We do, however, conclude that the Comptroller may not,

by regulation, achieve the result reached by his fifth example (COMAR 03.03.07.32B (5)), and that, to the extent his definitional regulations (COMAR 03.03.07.32A (1), (2), and (7)) permit that result, they exceed the scope of his statutory authority and are, for that reason, invalid. *Compare Day Enterprises, Inc. v. Crown Central Petroleum,* 529 F.Supp. 1291, 1297 (D.Md. 1982), where, in an action brought by a Crown dealer under the Federal Petroleum Marketing Practices Act, the U. S. District Court attacked more directly the Comptroller's fifth example and concluded that "[i]t is not illegal under Maryland law for a company such as Crown to require that its dealers devote to their Crown stations 90 percent of the time they devote to business matters."

### (2) *Void For Vagueness; Improper Legislative Delegation*

In light of our conclusion that the challenged regulations are invalid by reason of being legislatively unauthorized, it becomes unnecessary for us to decide the more fundamental constitutional issues initially raised by Crown. *See State v. Raithel,* 285 Md. 478, 484 (1979): "[N]othing is better settled than the principle that courts should not decide constitutional issues unnecessarily." *Also Scott v. State,* 289 Md. 647, 651 (1981).

### (3) *Validity of Crown's Lease Agreement*

The circuit court's decree, as we have noted, not only struck down the Comptroller's definition of "subsidiary," but, in its second paragraph, also declared that the operation of Crown's service stations pursuant to the 1978 or 1979 Branded Service Station Lease And Dealer Agreement "by an independent service station dealer which is not otherwise a subsidiary company within the meaning of [§ 157E] is not operation by Crown of such service station with company personnel [or] a subsidiary company. . . ."

That part of the decree was also entered through the summary judgment procedure, and the Comptroller now complains that it is not supported by undisputed material facts. We disagree.

The second paragraph of the decree is carefully worded

and limited in scope. It does not put any broad stamp of approval on Crown's operation or necessarily insulate Crown from further attack on the premise that one or more of its dealers may, under the law, be regarded as subsidiaries. The declaration is a conditional one — that the dealer be "independent" and "not otherwise a subsidiary company." With that caveat, and in light of the issues actually raised, argued, and decided in the circuit court, it does no more than make manifest the court's determination that the factors set forth in COMAR 03.03.07.32B (5) do not, of themselves, suffice to convert an otherwise legally independent dealer into a Crown subsidiary or Crown employee.

In that context, we find no material dispute of fact in the record sufficient to defeat the declaration by summary judgment. Indeed, the only material dispute alleged by the Comptroller, in the lower court or before us, is based upon his mistaken notion that the law permits him to regulate the contractual relationship between refiner/producer and dealer and to restructure by administrative fiat their relative economic bargaining strengths.[4] Once that legal premise falls, the limited declaration in paragraph two would naturally follow.

> *Judgment affirmed; appellant to pay the costs.*

*Garrity, J., dissenting:*

I respectfully dissent from the majority in this case.

The "warrant" for the regulatory authority, not found by the majority, to prohibit refiners from exercising practical control of management and operation of the service stations through indirect contractual requirements, lies in the very heart of the rationale and purpose of the divestiture statute.

---

4. Crown argues that the Comptroller actually conceded the lack of material dispute of fact. We think it reads too much into the colloquy between counsel and the court, however. In his memorandum in opposition to Crown's motion, the Comptroller did assert a material dispute; but, as we noted, it was based upon a mistaken notion of what the law was intended to do and what it permitted him to do.

As stated by the Court of Appeals in *Governor v. Exxon Corp.,* 279 Md. 410, 427, 370 A.2d 1102 (1977), *aff'd,* 437 U.S. 117 (1979), the legislative purpose was to ensure the continued existence of independent retail gasoline service station. dealers. The underlying rationale was that the continuation of independence would serve as a means of preserving competition and thereby prevent monopolistic control of gasoline marketing by a few large oil companies.

At public hearings on the bills, proponents of the divestiture law argued that the independence of gasoline dealers was threatened, that leases of independent dealers were being cancelled, that dealer-owned or operated stations were being discriminated against in the allocation of product and pricing policies, and that stations were being converted to company operation. The legislature heard testimony that "the major oil companies intended to control and monopolize retail marketing of gasoline by reducing and eliminating competition from independent dealers". *Governor v. Exxon Corp., supra.*

Crown's leasing arrangement typifies the illegal practical control that the legislature intended to prohibit as it clearly frustrates the goal of ensuring the continued existence of independent service station dealers.

Crown's lease requires that all dealers spend at least 40 hours per week at their service station and that they operate the station for at least 90 per cent of the total time that they may spend upon any business enterprise. For example, if the dealer spends only eight hours a week in an unrelated venture, the 90 per cent requirement compels him to spend 72 hours at his station. Thus, the additional time requirement nullifies a dealer's ability to participate meaningfully in a different business venture which would produce a viable source of income. See *Day Enterprises, Inc. v. Crown Central Petroleum,* 529 F.Supp. 1291 (D.Md. 1982). Crown readily admits that the effect of these provisions is to prevent the dealer from operating more than one station. The real purpose and obvious resultant effect of the combined "one station/40 hour/90 per cent scheme" is to maintain economic

control over a retail service station dealer, the very evil which the legislature attempted to remedy.

The nub of the problem is that by virtue of such economic dominance caused by requiring the dealer to spend nearly all of his working time at the service station, the so-called "independent" dealer is limited to only one source of income — the sale of gasoline — which is under the control of his supplier. Such indirect economic dominance through a contractual scheme may be just as invidiously repugnant to independence as direct ownership.

As Mr. Arthur E. Price, the state's expert witness explained, "Such a requirement would create a circumstance of economic dependence so great that the dealer would be controlled as if he were an employee or a subsidiary". In this way, the anticompetitive and unfair pricing practices utilized by producer or refiner controlled stations before the enactment of the divestiture law, could be continued.

It is evident that Crown's standard lease is intended to ensure that it will retain complete economic dominance over its dealers. Through its superior bargaining power, Crown can destroy the dealer's ability to exercise independent business judgment and to compete freely in the retail gasoline market.[1]

The standard for judging whether regulations are "necessary for the proper administration of" the law under which they were promulgated, is to determine if they are "reasonable and consistent with the letter and policy of that law". *Baltimore v. William E. Koons, Inc.,* 270 Md. 231, 237, 310 A.2d 813 (1973); *Farber's, Inc. v. Comptroller,* 266 Md. 44, 50-51, 298 A.2d 658 (1972).

I believe that the very essence of the divestiture law is the

---

[1]. In its amicus brief, the Greater Washington/Maryland Service Station Association points out that the resultant injury to dealers is far from hypothetical. We are reminded that in Phillips v. Crown Central Petroleum Corporation, 602 F.2d 616 (4th Cir. 1979), cert. denied, 444 U.S. 941 (1980), the Court found that Crown had a history of manipulating its dealers' retail prices to prevent price erosion at the wholesale level. The Court also reaffirmed the express finding by the trial court of Crown's "proclivity for persistently disregarding the antitrust laws".

prohibition of control, *either directly or indirectly,* by producers and refiners over retail service station operators. In this area of very sensitive and vital public concern where it is most essential to maintain the stability and independence of gasoline service station dealers, the Comptroller should, in the execution of his legislative charge, prevent an otherwise independent entity from becoming economically dependent through a contractual relationship. I would conclude that the concept of "practical control" through economic dominance, as illustrated by the Comptroller's fifth example, is clearly consistent with the legislative policy as it is designed to prevent producers and refiners from doing indirectly, by a contractual scheme, what they could not do directly.