Carlos **HORCASITAS**

v.

**CROWN CENTRAL PETROLEUM CORPORATION.**

Torsak **ROSSAKI**

v.

**CROWN CENTRAL PETROLEUM CORPORATION.**

Civ. Nos. JFM–86–3246, JFM–86–3336.

United States District Court,
D. Maryland.

Dec. 3, 1986.

Harry C. Storm, Bethesda, Md., for plaintiff.

Patricia McDonald, Baltimore, Md., for defendant.

## MEMORANDUM

MOTZ, District Judge.

Carlos Horcasitas and Torsak Rossaki have brought this action against Crown Central Petroleum Corporation under the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. section 2801 et seq., seeking injunctive relief prohibiting Crown from terminating them as franchisees of Crown products. On July 31, 1986 Crown sent to both plaintiffs a notice of termination, and on October 7, 1986 Crown sent to both plaintiffs a supplemental notice of termination. By agreement of the parties the status quo has been maintained pending resolution of plaintiffs' motion for preliminary injunction. On November 28, 1985, after full discovery had been conducted and extensive legal memoranda submitted, a hearing on that motion was held. The motion will be denied.

### FACTS

Plaintiffs formerly were franchisees for B.P. Oil Company. As of April 1, 1986, as the culmination of negotiations which had begun months earlier, BP ceased most of its retail operations in Maryland and transferred to Crown its interest in numerous gasoline stations in the state. Horcasitas had been a BP dealer at two locations and Rossaki had been a BP dealer at three locations. In accordance with the requirements of PMPA, Crown offered Horcasitas a Crown franchise at one of his locations and offered him the right of first refusal to purchase the other location. Crown likewise offered Rossaki a Crown franchise at one of his locations and the right of first refusal to purchase the other two locations. Horcasitas and Rossaki accepted all of the offers made to them by Crown.

Crown's standard Dealer's Agreement (executed by Horcasitas and Rossaki in February 1986) contains a dealer attendance provision which requires the dealer to spend at least forty hours per week and ninety percent of his working time at the station where he is a Crown dealer. It is undisputed that neither Horcasitas nor Rossaki spend forty hours a week at their Crown stations. Horcasitas spends from one hour (according to a private investigator hired by Crown) to twenty or thirty hours (his own estimate) per week at his Crown station; Rossaki spends between five and ten hours at his. Similarly, neither plaintiff meets the ninety percent of all working time requirement of the Dealer's Agreement. Horcasitas spends at most fifty percent, and Rossaki at most twenty percent, of his time at his Crown station. They each have substantial other business interests, not only in the former BP stations which they purchased at the time of BP's withdrawal from the market but also in other stations which they have purchased since. Further, both of them serve as Mobil dealers at other locations which they own and their Mobil franchise agreements require them to spend most of their time at their Mobil stations.[1]

The Dealer's Agreement also contains a non-competition provision prohibiting a Crown dealer from owning a competing interest in another gas station within a general five mile radius of his Crown station or within ten miles of his station if located on the same roadway. This provision (as interpreted and applied by Crown) does not prohibit a dealer from owning a station within the defined geographical zone and leasing it out at a fixed rate, not based upon a percentage of sales. Horcasitas and Rossaki are both in violation of this provision as well because the former BP

---

1. Rossaki also serves as a Texaco dealer at still another location.

stations which they now own are within the defined geographical zone and the present interests which they have in those stations are "competing" ones within the meaning of the Dealer's Agreement.

The original notices of termination sent to Horcasitas and Rossaki on July 31, 1986 both list as grounds for termination violations of the dealer attendance and the non-competition provisions. The notice to Rossaki recited two additional grounds: his failure to submit a report requested of him concerning his compliance with the dealer attendance requirement and his failure to provide Crown with a certificate showing that he was carrying workers' compensation insurance. It is undisputed that Rossaki never submitted to Crown the requested compliance report or that he has ever provided Crown with a certificate of insurance. Indeed, he had not provided the certificate of insurance by November 28, 1986, the day on which the preliminary injunction hearing was held.

The supplemental termination notices sent by Crown to plaintiffs on October 7, 1986 set forth as an additional ground for termination their receipt of an excessive number of unacceptable ratings by Crown's field inspectors over the six-month period after their franchises commenced. The unacceptable ratings for both plaintiffs arose from the failure of personnel working at their stations to wear the Crown uniform as required. A survey based upon routine inspection reports placed plaintiffs and a third dealer, Boo Chung, far at the bottom of the list concerning compliance with Crown's operating standards.[2] Horcasitas' rate of unacceptable ratings was 38.9% and Rossaki's was 31.4%. The next closest dealer on the list (other than Chung) received unacceptable ratings only 16% of the time.

## DISCUSSION

It is clear that the hardships imposed upon Crown by the issuance of a preliminary injunction would be less than the hardship which plaintiffs would suffer if the preliminary injunction were not granted. Therefore, the only issue presented in connection with the pending motion is whether "there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation." 15 U.S.C. section 2805(b)(2)(A)(ii).

While admitting their violations of their franchise agreements and candidly stating their intent to continue to violate the dealer attendance and non-competition provisions in the future, plaintiffs nevertheless contend that "a fair ground for litigation" exists. Their argument is fourfold: (1) the dealer attendance and non-competition provisions are not reasonable or of material significance to the franchise relationship of the parties; (2) Crown waived its right to enforce those provisions; (3) Crown's termination of the franchises on the grounds of Rossaki's failure to provide to Crown a dealer attendance report and a certificate of insurance and of the unacceptable ratings given to both plaintiffs is unreasonable; and (4) the various provisions of Crown's Dealer Agreement establish such a degree of control over plaintiffs that they are "company personnel" within the meaning of Maryland's Divestiture Act, Maryland Code Ann. Art. 56, section 157E(b).[3]

---

2. Chung was a co-plaintiff with Rossaki in a prior case which was brought against BP and Crown. His unacceptable ratings centered around the unauthorized parking of a vehicle at his Crown station in the early period of his dealership. Chung resolved this problem and therefore, although his percentage of unacceptable ratings was slightly higher than Rossaki's, Crown decided that it was inappropriate to institute termination action against him.

3. Horcasitas also argues that this Court should defer ruling until pending litigation between Crown and the landlord of Horcasitas' Crown

dealership is resolved. Horcasitas contends that if Crown loses that litigation, it will no longer have the right to possession of the premises in question. There is no reason for this Court to await the resolution of that litigation before ruling here. If, as this Court finds, Crown's grounds for terminating Horcasitas' franchise are unassailable, Crown is entitled to exercise its rights of termination immediately and have another dealer in place at Horcasitas' location for however long it will continue to have a right of possession at the location.

*The Dealer Attendance and Non-Competition Provisions*

■ The primary focus of plaintiffs' challenge to the dealer attendance and non-competition provisions of the Dealer's Agreement is that these restrictions are unreasonable in light of the origin of the parties' relationship. As BP dealers, plaintiffs were operating at more than one location and these locations were within the geographical zone in which Crown's non-competition provision has effect. Therefore, according to plaintiffs, when they accepted Crown's offers to become a dealer at one location and to purchase the other locations at which they had been operating, they necessarily were in conflict with the provisions in question.

The fallacy in plaintiffs' argument is that their acceptance of Crown's offers did not necessarily put them in violation of Crown's Dealer's Agreement. Plaintiffs could very well have an investor's interest in the stations which they purchased while simultaneously spending at least forty hours per week and ninety percent of their working time at their Crown dealerships. Likewise, they would not be in violation of the non-competition provision if they received a fixed rate of income from their interests in the nearby stations.[4] Furthermore, plaintiffs ignore the fact that their violations do not arise solely from the stations which they purchased at the time that BP withdrew from the market. Each of them has acquired an ownership interest in at least one more station since that time. While these stations are outside of the geographical zone defined in the non-competition provision, they are additional business interests which will require plaintiffs' time and attention and which will contribute to their continuing violations of the dealer attendance provision.

Plaintiffs also contend that as a general matter a serious question is presented as to whether the dealer attendance and non-competition provisions are reasonable and

of material significance to the franchise relationship. They cite *Khorenian v. Union Oil Co. of California*, 761 F.2d 533 (9th Cir.1985), for the proposition that the reasonableness of a personal supervision requirement is a matter which "should be explored fully at trial before any final determination is made as to whether there was a contractural violation that undermined the franchise relationship." *Id.* at 536. *Khorenian* is distinguishable in two respects. First, plaintiff's non-attendance at his station in *Khorenian* was caused by the fact that he had suffered a heart attack, not that he had other widespread and competing business interests, and in his absences he left in charge of his station his son who had been involved in management of it for many years. Second, one of the provisions in issue here—the non-competition agreement—was not in issue at all in *Khorenian*.

In any event, this Court is fully satisfied that when evaluated under the proper legal standard, the provisions in question are reasonable ones. Both the legislative history of PMPA and the cases construing PMPA make clear that this Court is not to substitute its own business judgment for that of the franchisor but simply to determine whether the franchisor's policies and franchise requirements have some reasonable basis and are being applied in the normal course of business and in good faith. *See, e.g.,* S.Rpt. No. 731, 95th Cong., 2d Sess., 37, (1978) *reprinted in* 1978 U.S. Code Cong. and Ad. News, 873, 895–96; *Brach v. Amoco Oil Co.*, 677 F.2d 1213 (7th Cir.1982); *Crown Central Petroleum Corp. v. Waldman*, 515 F.Supp. 477 (M.D. Pa.1981) aff'd, 676 F.2d 684 (3d Cir.1982). Self-evidently, there is some reasonable basis for Crown's dealer attendance and non-competition requirements. They are rooted in common sense and are not unconscionable. Further, they have been adopted in the normal course of Crown's business and plaintiffs do not contend that they have

---

**4.** Plaintiffs' counsel conceded during oral argument that such an interest is not uncommon in    the industry.

been enforced in an arbitrary or uneven-handed manner.

### Crown's Alleged Waiver

■ Plaintiffs next argue that Crown waived its right to enforce the dealer attendance and non-competition requirements. To a degree plaintiffs' waiver argument coincides with its contention that Crown's simultaneous offers of a dealership at one location and ownership of others necessarily were inconsistent. This position is erroneous for the reasons previously stated. In addition, plaintiffs contend that during the course of the negotiations between Crown and themselves various representatives of Crown indicated that Crown might not insist upon full compliance with the requirements.

This argument fails on several grounds. First, plaintiffs admit that they knew that the Crown representatives with whom they were speaking did not have the authority to modify any provision of the Dealer's Agreement on Crown's behalf. Second, the statements, even as phrased by plaintiffs, fall far short of a waiver. For a person to say that he may not enforce his rights is not to say that he is waiving them. Third, the facts pertaining to this issue are so contradictory of plaintiffs' position that no serious question providing a fair ground for litigation is presented.

The written correspondence between the parties makes it abundantly clear that Crown was insisting upon full compliance. As early as December 23, 1985, Crown sent plaintiffs (and all other BP dealers) a letter which stated, *inter alia,* that "a basic tenet of Crown's marketing philosophy is the belief that the level of success of a service station operation is significantly affected by the personal attention devoted to that station by its dealer. Our experience has been that full time attention of a dealer to a single station operation is absolutely essential if that facility is to achieve its realizable potential." By its February 7, 1986 letters to plaintiffs, Crown expressly stated that it would consider the acquisition of a prohibited interest in adjacent locations as a violation of the non-competition provision.

On February 6, 1986 and February 7, 1986 (at the same time that they were executing the Dealer's Agreement), plaintiffs wrote identical letters to Crown protesting the reasonableness of certain terms of the franchise, including the full time attendance requirement and the non-competition provision. In those letters they allude to the fact that their efforts to negotiate changes in those provisions had been *rejected* by Crown. On February 18, 1987 Crown replied, reiterating the importance of the dealer attendance requirement. Further, in an affidavit in related litigation filed in this Court in March 1986, Rossaki stated that he requested Crown to negotiate a number of terms in his franchise agreement to which he objected and that in response Crown said that it was "tough luck" and that Rossaki could sue BP over the matter.

### The Other Grounds For Termination

Violation of the dealer attendance and non-competition provisions were the only grounds for termination stated in Crown's original notice sent to Horcasitas on July 31, 1986. Two additional grounds stated in the original July 31st notice to Rossaki were his failure to provide Crown with a requested report concerning his compliance with the dealer attendance provision and a certificate of workmen's compensation insurance.

■ Rossaki does not deny that he committed each of these violations. Rather, his position seems to be that the violations are only minor ones which do not warrant termination. That position is untenable. A franchisor is entitled to insist upon reporting requirements from its franchisees on material matters pertaining to the franchise. If in a given case the failure to provide such information on a timely basis was shown to be the result of oversight or a single lapse after a history of solid compliance, a fair ground for litigation concerning the reasonableness of a termination based upon the act of non-compliance might be presented. Here, however, Rossaki's failure to provide the requested report is indicative of what the

other facts on the record clearly establish to be his attitude of defiance toward Crown. PMPA does not require Crown to tolerate intentional disregard of its Dealer's Agreement.

The supplemental notices of termination sent to plaintiffs on October 7, 1986 state as a further ground for the termination of their franchises the high level of unacceptable ratings which they had received on reports of inspections periodically made of their stations by Crown representatives during the period April 1, 1986 through September 30, 1986. Plaintiffs contend that whether or not these unacceptable ratings were warranted is a matter of factual dispute which requires a trial for resolution. Although plaintiffs have pointed to no specific facts which indicate that the ratings were arbitrarily made, if this Court were to uphold the terminations solely on the basis of these reports it would require a fuller evidentiary hearing.[5] Thus, this Court does not base its denial of the preliminary injunction upon the unsatisfactory inspection ratings. However, it is not inappropriate to note that the high percentage of plaintiffs' unsatisfactory ratings in comparison to other dealers—a fact uncontradicted on the record—does appear to be reflective of the poor performance which can result from a lack of dealer attendance at his station.

*The "Company Personnel" Issue*

■ The final issue raised by plaintiffs is that through the various provisions in its Dealer's Agreement Crown exercises such a degree of control over its franchisees that they are "company personnel" within the meaning of the Maryland statute requiring gasoline producers or refiners to divest themselves of any service station which they operate. *Maryland Code Ann.* Art. 56, section 157E(b). Plaintiffs are cor-

rect in contending that this precise issue has not yet been decided. In *Comptroller of the Treasury v. Crown Central Petroleum Corp.*, 52 Md.App. 581, 451 A.2d 347 (1982), the Maryland Court of Special Appeals only struck down as beyond the scope of the Comptroller's authority regulations which he had promulgated decreeing that certain franchise provisions converted franchisees into "subsidiaries" or "company personnel." The Court left open the question of whether there may be "situations in which, through the device of an external contract frequently entered into, a refiner can achieve such a degree of control over the internal management of a dealer as to render the purportedly external relationship a sham." 52 Md.App. at 596, 451 A.2d at 354.[6]

Nevertheless, the opinion in *Comptroller v. Crown Central* is instructive on the question here presented. The Court pointed out that Maryland's General Assembly intended that the Gasoline Products Marketing Act, *Md. Code Ann., Commercial Law Art.*, sections 11–301 et seq., not the divestiture law, was the means by which the General Assembly intended to regulate the relationship between franchisors and franchisees. Plaintiffs make no contention that the provisions in Crown's Dealer's Agreement violate the former. Further, the type of "control[s] over the internal management of a dealer" to which the Court referred in *Comptroller v. Crown Central* are controls over a dealer's hiring practices, pay scales, pricing policies and profit allocation. 52 Md.App. at 596, 451 A.2d at 354. Plaintiffs make no contention here that Crown exercises any such controls over them. Rather, the only provisions in the Dealer's Agreement to which plaintiffs point are ones which relate directly to furthering and maintaining Crown's

---

**5.** Crown did have available at the preliminary injunction hearing the field representatives who had conducted the inspections and filed the reports. The Court did not ask them to testify because it had reached the tentative conclusion prior to the hearing (based upon its review of the memoranda and supporting papers) that the other grounds for termination were fully justi-

fied and that the taking of the testimony would have therefore been a waste of time.

**6.** Likewise, *Day Enterprises, Inc. v. Crown Central Petroleum Corp.*, 529 F.Supp. 1291 (D.Md. 1982) dealt only with the question of whether Crown's dealer attendance requirements caused its franchisees to be "subsidiaries."

own interests in the franchise relationship. For the reasons previously stated, these provisions are entirely reasonable ones both under state and federal law.

 For these reasons, plaintiffs' motion for a preliminary injunction is denied. A separate order to that effect is being entered herewith.